Andrew M. Calamari
Sanjay Wadhwa
Gerald A. Gross
Alexander M. Vasilescu
John W. R. Murray
Karen M. Lee
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0178 (Vasilescu)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | ECF CASE |
| v. | ) ) | |
| AMERICAN GROWTH FUNDING II, LLC, PORTFOLIO ADVISORS ALLIANCE, INC., RALPH C. JOHNSON, HOWARD J. ALLEN III and KERRI L. WASSERMAN | ) ) ) ) ) ) | COMPLAINT AND JURY DEMAND |
| Defendants. | ) ) | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants American Growth Funding II, LLC ("AGF II"), Portfolio Advisors Alliance,

Inc. ("PAA"), Ralph C. Johnson ("Johnson"), Howard J. Allen III ("Allen") and Kerri L.

Wasserman ("Wasserman") (collectively, "Defendants"):

## SUMMARY OF ALLEGATIONS

1.      This action concerns a series of fraudulent misrepresentations and omissions

about the audit status, management, and financial condition of AGF II, a company that raises capital from investors to provide loans to businesses. Through PAA, a registered broker-dealer, AGF II sold approximately $8.6 million worth of AGF II units to at least 85 investors in a private placement between March 2011 and December 2013. Unbeknownst to AGF II's investors, however, AGF II's principal asset (a loan receivable from an affiliate) has greatly deteriorated in value, imperiling the likelihood that investors will be fully repaid, let alone realize their promised return of 12% per annum interest.

2.      In connection with the offering of AGF II units, AGF II and its principal, Ralph Johnson, issued two private placement memoranda ("PPMs") in 2011 and 2012 (respectively, the "2011 PPM" and "2012 PPM"). Both PPMs represented that AGF II's financial statements had previously been audited and would continue to be audited within 90 days of the end of each fiscal year. Those representations were false. In fact, AGF II's financial statements for 2011 and 2012 were not audited until January and February 2014, respectively. Johnson was centrally involved in preparing the PPMs and therefore knew, or recklessly disregarded, that the representations about prior audits were false when made to investors.

3.      In addition to the misrepresentations in the PPMs, in October 2013, Johnson caused to be sent to AGF II investors an email falsely stating that an accounting firm had begun work on an audit. As Johnson was aware, however, the accounting firm never agreed to perform an audit for AGF II, much less commence any audit work.

4.      PAA and its owner, Howard Allen, learned by at least June 2012 that the PPMs falsely represented that AGF II's financials had been and would continue to be audited. Allen nevertheless continued to send the 2012 PPM to investors for more than a year thereafter to solicit sales of AGF II units, without informing any investors that no audits had been performed

2

or that the representation in the PPM regarding an audit was false.

5.     Shortly after Allen became aware that the PPMs were false, he informed Kerri Wasserman, PAA's President, that the PPMs falsely represented that AGF II had been audited. Despite having been made aware of the PPMs' falsity, Wasserman took no action to stop PAA's registered representatives from using the PPM to solicit sales of AGF II units, or to ensure that registered representatives told investors that, contrary to the PPM, no audit had been performed.

6.     AGF II's PPMs also misrepresented the extent and expertise of AGF II's management.  Both the 2011 and 2012 PPMs represented that the entity that managed AGF II was governed by a "Board of Managers" consisting of Johnson and two other individuals, whom the PPMs described, respectively, as "Chief Underwriting Officer" and "Executive Vice President of Business Development."  In fact, as Johnson knew or recklessly disregarded, neither of the two other individuals ever agreed to serve in any managerial capacity for AGF II or performed any of the roles that the PPMs attributed to them.

7.     Furthermore, between 2011 and 2014, Johnson caused AGF II to send misleading monthly account statements to investors that concealed the precariousness and falling value of the asset that backed AGF II's payment obligations to its investors – *i.e.*, a receivable from an affiliate that, in turn, was backed by loans it made to small businesses.  Each of those statements listed the notional balance of each investor's investment, but did not disclose that the majority of AGF II's loans to private businesses were at the time greater than 90 days overdue or otherwise likely uncollectible.  The statements therefore misleadingly overstated to investors the true value of their investments, and omitted to disclose that their accounts were worth far less than their purported account balances because most of AGF II's loans were non-performing.

8.     By virtue of the conduct alleged herein:  (A) each of AGF II, PAA, Johnson and

3

Allen, directly or indirectly, singly or in concert, has engaged in acts, practices and courses of business that constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (2) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)]; (B) Johnson is liable as a controlling person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for the violations of AGF II under Sections 17(a)(1), (2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder; (C) Allen and Wasserman are liable under Section 20(a) of the Exchange Act as controlling persons for the violations of PAA under Sections 17(a)(1), (2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder; (D) Johnson aided and abetted the violations of AGF II under Sections 17(a)(1), (2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder; (E) Allen aided and abetted the violations of Johnson, AGF II and PAA under Sections 17(a)(1), (2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder; and (F) Wasserman aided and abetted the violations of Johnson, AGF II, Allen and PAA under Sections 17(a)(1), (2) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) thereunder.

9.     Unless the Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange

Act [15 U.S.C. § 78u(d)(1)] seeking to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.

11.    The Commission also seeks a final judgment ordering AGF II, PAA, Johnson and Allen to disgorge their ill-gotten gains, together with prejudgment interest thereon, and ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the events constituting or giving rise to the alleged violations occurred in the Southern District of New York.  For instance, AGF II and PAA maintained their respective principal places of business in New York, New York during the time of the conduct at issue in this complaint.

14.    In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

## DEFENDANTS

15.    AGF II is a limited liability company incorporated in Nevada in 2010 with its principal place of business in New York, New York.  AGF II has never been registered with the Commission in any capacity and is managed by AGF Management II LLC ("AGF Management

5

II"), which is operated by Johnson and owned by Johnson and Allen, via their entities Juris

Capital Management, LLC ("Juris") and Pelham, LLC ("Pelham"), respectively.

16.     PAA is a registered broker-dealer with its principal place of business in New

York, New York.  PAA was incorporated in California in March 1999, and is indirectly owned

by Allen.  PAA acted as the selling agent for AGF II's offering.

17.     Johnson, age 45, resides in Colts Neck, New Jersey.  Through his entity, Juris,

Johnson owns 51% of AGF Management II.  He is the managing member of several AGF

entities that raise money from investors to finance small businesses with loans.  At all relevant

times, Johnson was AGF II's sole managerial employee, and he alone made all business and

financial decisions on behalf of AGF II.

18.     Allen, age 52, resides in Tarrytown, New York.  He has been a registered

representative since 1991 and has been the indirect owner of PAA through his ownership of

Allen Partners Capital Group LLC, which directly owns PAA.  Allen owns Pelham, which is a

49% owner of AGF Management II.  As PAA's owner, Allen exercised control over PAA.

Among other things, Allen determined the private placements for which PAA acted as placement

agent, managed PAA's role as placement agent for AGF II, and, on behalf of PAA, had

discretion, along with Johnson, over the contents of the AGF II PPMs.  Moreover, other

registered representatives at PAA were subordinate to Allen.

19.     Wasserman, age 45, resides in Oceanside, New York.  She is the President of

PAA.  Wasserman became a registered representative in 1993.  From 2011 to the present, all

PAA employees reported to, and were supervised by, Wasserman.

## THE DEFENDANTS' VIOLATIVE CONDUCT

### Background

20.     In 2008, Johnson began operating American Growth Funding LLC ("AGF LLC") to provide high-risk, high-interest loans to businesses that had difficulty obtaining credit from conventional lenders.  To that end, Johnson and AGF LLC raised capital using three vehicles: American Growth Funding I LLC ("AGF I") (formerly known as AGF 2008 Pool), AGF II and American Growth Funding III LLC ("AGF III").  Between March 2011 and December 31, 2013, AGF II sold approximately $8.6 million worth of its units to at least 85 investors.  AGF II engaged PAA as placement agent to sell its units to investors.

21.     In exchange for a minimum investment of $50,000, AGF II promised to pay investors a one percent return per month (totaling 12% return per annum).  According to the PPMs, one month after the units were issued, monthly distributions were to be made to each investor in an amount equal to one percent of the investor's unreturned capital contribution.

22.     Also according to the PPMs, AGF II received investor proceeds through the offering of units.  The PPMs disclosed that after 10 percent commissions were paid to PAA, the remaining proceeds were transferred to AGF II.

23.     Not detailed in the PPMs, however, was the following transaction structure:  after receiving investor funds, AGF II loaned the proceeds to AGF LLC, its operating company, and in exchange, AGF LLC issued promissory notes to AGF II, with no due dates, generally at a rate of 24 percent annually.  Thus, AGF II's investor funds, along with the investor funds of AGF I and AGF III, were loaned to AGF LLC.  AGF LLC then loaned those funds to AGF LLC customers (*i.e.*, third-party businesses), who were generally obligated to repay in 30, 60 or 90 days the principal plus interest.  Under this arrangement – again, not detailed in the PPMs – AGF

LLC would pay the funds back to AGF II (and AGF I and III) only when AGF LLC customers

repaid the loans.

### AGF II's PPMs Falsely Stated That AGF II Was and Would Be Audited

24.     AGF II's initial PPM, dated February 11, 2011, stated:

**Method of Accounting**

The Company will maintain its books and records and report its income tax
results according to the cash method of accounting. As has been policy in the
past, the Company's annual financial statements will continue to be audited by an
independent firm of certified public accountants.

25.     This representation was false when made. AGF II at the time was a newly-

formed entity, and therefore, its financial statements had never been audited. The representation

that AGF II's financials would continue to be audited per its "policy in the past" was therefore

misleading.

26.     In addition, AGF II's operating agreement, which was attached to the 2011 and

2012 PPMs, provided in pertinent part:

**11.5 Company Reporting Obligations.** The Company [*i.e.*, AGF II] shall
furnish the following financial statements and reports to the Members [*i.e.*,
investors]: (i) within ninety (90) days after the end of each Fiscal Year, annual
audited financial statements of the Company[.]

27.     Thus, along with the audited financials language in the PPM, AGF II represented

to investors that its financial statements would be audited on a regular and timely basis following

the end of each fiscal year. This representation, too, was false, because, as Johnson was aware,

AGF II's financial statements for 2011 and 2012 were not audited in a timely fashion at the end

of 2011 and 2012. In fact, those financial statements were not audited until January 15, 2014,

and February 5, 2014, respectively.

28.     AGF II issued an updated PPM, dated February 25, 2012. The audited financials

8

language in the 2012 PPM was revised substantially to state (revisions in italics):

**Method of Accounting**

The Company will maintain its books and records and report its income tax results according to the cash method of accounting. As has been policy in the past, the Company's annual financial statements will continue to be audited by an independent firm of *outside* accountants. *In the past, the company has used [Entity A], conducting business in New York for over 30 years, and will likely continue to do so.*

29.     As in the 2011 PPM, the representation in the 2012 PPM that AGF II's financial statements had been audited pursuant to "policy in the past" was false and misleading because no audit was completed for AGF II until 2014.

30.     Moreover, the added sentence referring to Entity A, which Johnson drafted, was also false. That entity did not exist, although the entity name used by Johnson bore a close resemblance to the name of a tax preparer based in Staten Island, New York ("Staten Island Tax Preparer"), who did business at the time under a different name. Moreover, neither the Staten Island Tax Preparer nor anyone employed by his firm in 2012 was a certified public accountant, meaning that his firm was not qualified to perform audits. Thus, neither the Staten Island Tax Preparer nor his firm ever performed an audit for AGF II.

**Johnson Knew, or Recklessly Disregarded, That the Representations**
**In the PPMs Regarding Audited Financials Were False**

31.     At the time the 2011 and 2012 PPMs were issued, Johnson knew, or recklessly disregarded, that their representations concerning an audit were false.

***Johnson's Involvement in the Drafting and Review of the PPMs***

32.     Johnson was the only AGF II employee involved in the preparation of the PPMs, and, with Allen, was centrally involved in drafting and finalizing the PPMs.

33.     In February 2010, Johnson provided Allen with a template for the 2011 PPM,

which represented that "[t]he Company's annual financial statements will be audited by the independent firm [*sic*] of certified public accountants." Johnson reviewed the template in its entirety at or about the time he sent it to Allen.

34.     Along with Allen, Johnson exercised ultimate authority over and determined the contents of the 2011 and 2012 PPMs, including their representations with respect to an audit.

35.     Johnson also acted as the "keeper" of the PPM during the drafting process, receiving and entering changes that PAA requested. During that process, Johnson and Allen discussed the contents of, and revisions to, the draft.

36.     The final version of the audited financials language in the 2011 PPM was revised in two ways from the template: the phrase "As has been policy in the past" was added, and the grammatical error in the template ("the independent firm") was corrected ("an independent firm").

37.     Johnson was also closely involved in preparing the 2012 PPM. He advised PAA as to what revisions were appropriate in that PPM and approved the PPM for distribution. For example, on February 22, 2012, Johnson forwarded an updated version of the PPM to Allen and Allen's assistant, writing: "Here is the updated book as we discussed. … You may rename and distribute in place of the expired PPM starting tomorrow." Allen's assistant responded by email the following day: "Howard is out of the office …. We will review the book and touch base on Monday regarding it."

38.     Johnson also drafted the language in the 2012 PPM representing that Entity A had previously audited, and would continue to audit, AGF II's financial statements. As detailed below, Johnson knew, or recklessly disregarded, that neither Entity A nor the Staten Island Tax Preparer had ever performed an audit for AGF II.

*Johnson's Inconsistencies Regarding an Audit*

39.     When initially questioned by the Commission staff in 2013, Johnson claimed that AGF II could not afford, and had not intended, to have its financial statements audited, and that he had instructed Allen or Wasserman to remove the audited financials language from the 2011 PPM before it was issued, but that Allen or Wasserman failed to do so.

40.     Johnson had, in fact, contacted an accounting firm ("Accounting Firm #1") to discuss the possibility of retaining Accounting Firm #1 to perform an audit for AGF II in 2011. However, while Accounting Firm #1 prepared a proposal letter for an audit of AGF II, it ultimately did not perform an audit for AGF II because it did not approve the proposed engagement.

41.     After Allen and Wasserman denied to the Commission staff in testimony that Johnson ever directed them to remove the PPM language regarding audited financials, Johnson testified before the staff on June 25, 2015, that, *inter alia*, he could not recall whose responsibility it was to change the audited financials language and that he had intended to have an audit performed once AGF II had sold $5 million worth of units.

*Johnson's Fabrication of an Audit Opinion Letter*

42.     In 2012, Johnson fabricated a letter purporting to contain an audit opinion from the nonexistent Entity A.

43.     On March 8, 2012, Johnson emailed the purported letter, dated March 6, 2012, in response to Allen's request for a copy of AGF II's financial statements.  Johnson attached the letter to his email as a PDF document, which Johnson titled "AGF II Audit Letter from GC 2011.pdf."

44.     The letter appeared on the letterhead of the same fictitious Entity A that Johnson

11

had referred to in the sentence that he drafted for the revised audited financials language in the 2012 PPM.

45.     The letter stated that, *inter alia*, Entity A had "examined the financial statements" of AGF II "in accordance with generally accepted audited [*sic*] standards" and that in its opinion, the financial statements fairly presented AGF II's financial condition "in conformity with generally accepted accounting principles[.]"  It also bore the purported signature of the principal of Entity A.

46.     Like Entity A, the letter was fictitious.

**Johnson's Lies about the Status of AGF II's Audits**

47.     By May or June 2012, Allen learned that the representation concerning an audit in the 2011 and 2012 PPMs was inaccurate.  Shortly thereafter, Allen told Johnson about the inaccuracy during a phone call, in which Johnson used profanity to express his concern about the misrepresentations in the PPMs, reflecting Johnson's awareness that AGF II's audit status was important.

48.     Johnson and Allen agreed that, because the 2011 and 2012 PPMs represented that AGF II's financial statements had been, and would continue to be, audited, AGF II should have an audit performed in order to comply, albeit belatedly, with the disclosure in the PPM.

49.     During 2012 and 2013, Johnson contacted several accounting firms, but as time passed without AGF II having retained an auditor, Allen grew increasingly concerned and repeatedly asked Johnson about the status of his discussions with auditing firms.  On multiple occasions in 2013, Johnson falsely told Allen and others that AGF II had retained an auditor.

50.     During 2013, Johnson told Allen that he had contacted an accounting firm ("Accounting Firm #2") about an audit.  On May 15, 2013, Allen emailed Johnson to ask

whether AGF II had retained Accounting Firm #2, and Johnson responded by email that same day: "I will be cutting a check this week and then [the partner at Accounting Firm #2 whom Johnson had contacted] will send back documents."

51.     In fact, as Johnson knew, or recklessly disregarded, AGF II never retained Accounting Firm #2 to perform an audit, and Accounting Firm #2 never agreed to do so.  Indeed, prior to his May 15, 2013 reply email to Allen, Johnson had rejected the idea of retaining Accounting Firm #2 for an audit after the firm informed Johnson that an audit would cost approximately $100,000, and Johnson's discussions with Accounting Firm #2 were thereafter focused solely on potential non-audit work – *i.e.*, a compilation of AGF II's financial statements and preparation of its tax returns.

52.     On May 20, 2013, Allen again asked for an update, and Johnson responded: "Spoke to [the Accounting Firm #2 partner] and he said we have to wait a few more days. Update you later this week."

53.     On May 24, 2013, responding to Allen's May 15, 2013, email asking whether AGF II had hired Accounting Firm #2, Johnson again responded falsely:  "I would say yes but we haven't 'officially' gotten back his signed agreement.  But verbally he said yes and we should have it any day."

54.     On October 1, 2013, Johnson emailed Allen to report that "AGF has engaged [another accounting firm ("Accounting Firm #3")] as auditor."  Again, Johnson knew, or recklessly disregarded, that this statement was false.  Accounting Firm #3 was never engaged to provide any services, audit or otherwise, to AGF II or to any entity connected to Johnson. Although Johnson met with Accounting Firm #3 during 2013 to discuss a potential compilation and tax return preparation for AGF II, Johnson never discussed the possibility of an audit with

13

Accounting Firm #3.  Thus, contrary to Johnson's representation, Accounting Firm #3 never

agreed to audit AGF II's financials, and never performed any audit work for AGF II.

55.      Allen responded by email to Johnson's October 1, 2013, email on the same date

with the question: "What years are they auditing?  As soon as you get the engagement

agreement could you send it [to] me?"  Johnson replied by email on the same date: "Yes.  I

should have it in a day or so, I just left his office with a check.  They are auditing 2011 and 2012,

and will try and complete immediately so they can do 2013 on time as well."

56.      Yet again, every detail of Johnson's October 1 reply was false.  As Johnson knew,

or recklessly disregarded, no engagement agreement for an audit by Accounting Firm #3 existed.

Moreover, neither Johnson nor AGF II, nor anyone on behalf of either, ever made any payment

to Accounting Firm #3.  And, finally, Accounting Firm #3 never performed any audit work for

AGF II.

57.      Johnson repeated this lie in an email discussion with AGF II's outside counsel

later that week.  In response to an October 7, 2013, email from counsel to Johnson and Allen's

personal assistant asking when the audit for 2011 would be ready, Johnson wrote that

Accounting Firm #3 was "working on it now and it probably will be done before year end."

58.      Johnson again misled AGF II's counsel and PAA in an October 8, 2013, email.  In

response to an email from counsel asking whether Accounting Firm #3 would audit the financial

statements for 2011 through 2013, Johnson wrote to counsel and Allen's assistant: "Yes, 2011-

2013 and foreseeable future."

**Johnson's and Allen's False October 8, 2013 Email to AGF II Investors**

59.      In addition to seeking to have a belated audit done, Johnson and Allen considered

addressing the misrepresentation in the PPM by amending AGF II's operating agreement and

PPM to eliminate the requirement of audited financials. In order to do so, however, AGF II needed to obtain the consent of the investors who owned a majority of AGF II units.

60.     Accordingly, on September 25, 2013, at Allen's direction, PAA emailed to certain AGF II investors a proposed amendment, and explained in the email that AGF II had "retained [Accounting Firm #2] to act as [AGF II's] accountants, and "would like to update the offering memorandum to reflect this, and to clarify the scope of the work to be done by [Accounting Firm #2]." This email did not disclose that the PPM was false or that AGF II and PAA had known it was false for at least 15 months.

61.     In response to the September 25, 2013 email, at least two large AGF II investors emailed PAA expressing strong objections to the proposal. One of them wrote to Allen's assistant, copying Allen: "When a fund does not want auditors that sounds dubious. What is it hiding. If the fund has no independent auditors I am seriously in doubt whether I want to stay invested." The other investor wrote to Allen: "I reviewed this amendment and am not happy.... Does the existing agreement provide for audited or unaudited financial statements? I can't believe I have put and kept over $500,000 in an unaudited entity. If true I may consider withdrawing."

62.     In light of these investors' sharply negative reactions, Johnson and Allen abandoned the idea of amending the operating agreement and PPM, and instead decided to send an "update" to some AGF II investors concerning the status of AGF II's audit. Johnson reviewed, commented upon, caused to be revised, and approved the final version of that email, which was dated October 8, 2013, sent from Allen's email address, and stated:

> On behalf of American Growth Funding II, LLC (the "Company"), we would like to update you on the status of the Company's annual financial statements. Management has prepared the financial statements as of and for the fiscal year ended December 31, 2011 and 2012, and the audits of those financial statements

are being done by the independent accounting firm of [Accounting Firm #3]....
We also expect to retain [Accounting Firm #3] to audit our financial statements
for 2013....

We regret that it has taken longer than anticipated to complete our audited
financial statements for 2011 and 2012.  We are working with our accountants to
expedite these audits, and we believe our efforts in this regard will enable us to
deliver the audited financial statements for 2013 on a more timely basis. ...

Regards,

AGF Management II, LLC

63.     As detailed above, Johnson knew, or recklessly disregarded, that Accounting Firm
#3 had neither agreed to conduct an audit of AGF II nor performed any audit work.  The
representation in the October 8, 2013 email that the 2011 and 2012 audits were "being done" by
Accounting Firm #3 was blatantly false.

64.     The October 8, 2013, "update" was also misleading because it characterized the
delay in completing the audits as simply having "taken longer than anticipated to complete," but
did not disclose that the PPM was inaccurate or that Johnson and Allen had decided to have
audits done so that AGF II would belatedly comply with the PPMs' representations that AGF II
had been, and would continue to be, audited.

**Allen Continued to Sell AGF II to Investors Using the PPM He Knew,
or Recklessly Disregarded, Was False**

65.     Allen knew no later than May or June 2012 that the representation in AGF II's
PPMs regarding audited financials was false.  He was also "concerned" after learning about this
inaccuracy and became worried about the "regulatory" implications of the misstatement.

66.     Allen nevertheless continued to send the PPM to potential investors until at least
the fall of 2013, and did not tell any investors after he learned of the PPM's falsity that AGF II's
financials had not been audited or that the PPM was inaccurate.

67.     Allen sold more AGF II units than any other PAA registered representative,

having procured 69 of the at least 85 investments in AGF II, and made most of those sales during

2013, after he became aware that the PPM was inaccurate.

68.     Between June 1, 2012, and December 31, 2013, Allen sold a total of $4,064,975

of AGF II units to 40 investors, for which PAA received approximately $406,498 in

commissions.  During the same period, other PAA registered representatives sold an additional

$2,809,300 of AGF II units, for which PAA received approximately $280,930 in commissions.

## Wasserman Knew, or Recklessly Disregarded, That the PPM Was False But Took No Steps to Ensure That AGF II Investors Were Told the Truth

69.     Wasserman, PAA's President, supervised all PAA employees, including Allen,

and approved both the 2011 and 2012 PPMs.

70.     Wasserman became aware by the second half of 2012 through a conversation with

Allen that the 2011 and 2012 PPMs falsely represented that AGF II's financial statements had

been, and would continue to be, audited.  She was also "concerned" when Allen told her about

this inaccuracy.

71.     In light of the false PPM language, Wasserman and Allen agreed that AGF II's

financials should be audited.  Allen also informed Wasserman during 2012 and 2013 that

Johnson was contacting accounting firms in order to have an audit of AGF II completed.

72.     Wasserman knew, or recklessly disregarded, during 2012 and 2013 that it was

standard practice for PAA's registered representatives, including Allen, to provide copies of

PPMs to prospective investors.  Wasserman also knew, or recklessly disregarded, that PAA

registered representatives continued to solicit investments in AGF II after she learned that the

AGF II PPMs were inaccurate.

73.     In addition, Wasserman understood, or recklessly disregarded, that whether AGF II's financials had been audited was information that investors would want to know.

74.     Wasserman also understood, or recklessly disregarded, that it was her responsibility at the time she learned the PPM was inaccurate to inform PAA's registered representatives that AGF II's financials had not been audited.

75.     Despite her responsibility to inform the registered representatives of the inaccuracy in the PPM, her awareness of the importance of an audit to investors, and her knowledge that PAA's registered representatives were continuing to solicit investments in AGF II using a false PPM, Wasserman took no action.

76.     Wasserman never informed PAA's registered representatives that the PPM was inaccurate.  Moreover, at no time after learning of the misrepresentation in the PPM did Wasserman take any steps, or make any attempt, to ensure that PAA's registered representatives disclosed to current or prospective investors that the PPM misrepresented AGF II's audit status, or that the registered representatives informed such investors that AGF II's financials had never been audited.

**AGF II's False Statements In Its PPMs Regarding AGF II's Management**

77.     AGF II's 2011 and 2012 PPMs represented that AGF II's managing entity, AGF Management II, was governed by a Board of Managers consisting of Johnson and two other individuals (respectively, "Individual A" and "Individual B").  Both PPMs also included biographical information for Individual A and Individual B.

78.     The PPMs also represented that Individual A "serves as Chief Underwriting Officer, sourcing and reviewing opportunities for AGF before they are presented to the Board for final review," and that Individual B "serves as EVP [Executive Vice President] of Business

Development for AGF, helping to source and manage its growth both organically and through acquisitions."

79.     The description of Individual A's role in the PPMs was false.  At most, Individual A provided only occasional, informal advice with respect to AGF II.  Individual A did not attend any board meetings of AGF Management II, never participated in any board votes, and never met the other purported board member, Individual B.  Moreover, Individual A never served as or held the title of Chief Underwriting Officer and had no decision-making authority with respect to AGF II.

80.     Likewise, the PPM's description of Individual B's role was fictitious.  Individual B never agreed to serve on the board of AGF Management II, never discussed AGF II business with Johnson, and never served as or held the title of Executive Vice President for AGF II.

81.     On one occasion, Johnson mentioned to Individual B that Individual B had been listed on the board of an AGF entity.  In response, Individual B told Johnson that he had never agreed to serve on any AGF board and instructed that his name be removed immediately because he could not and did not want to serve as a board member.  Individual B never participated in any other conversations about AGF II or its business with Johnson or anyone else.

82.     Neither Individual A nor Individual B ever reviewed, or gave Johnson permission to include, the biographical information for each of them that appeared in the PPMs.

83.     Johnson knew, or recklessly disregarded, that the composition of the board of AGF Management II was important to investors.  On July 20, 2012, after reviewing the PPM, a PAA registered representative emailed Allen to ask whether Individual A and Individual B were capable of managing AGF II in the event of Johnson's death or disability.  Allen forwarded the representative's email to Johnson on the same date.

19

**AGF II's Misleading Monthly Account Statements**

84.     Between 2011 and at least January 2014, Johnson caused AGF II to send monthly

account statements to its investors.  Each of the statements listed the principal invested, and for

the majority of AGF II investors who reinvested their dividends, added those amounts to identify

the "total balance" of each investor's investment.

85.     None of the account statements, however, disclosed that the majority of loans that

AGF LLC had made were, at the time, greater than 90 days overdue or otherwise unlikely to be

collectible, and thus, that each investor's account was worth significantly less than the purported

account balances listed in his or her statement.

86.     As of December 31, 2011, 2012 and 2013, approximately 77 percent, 87 percent

and 89 percent, respectively, of AGF LLC's outstanding loans receivable were over 90 days past

due or of unknown collectability – *i.e.*, loans made with no due dates or loan documentation, as

set forth below:

| | As of 12/31/2011 | As of 12/31/2012 | As of 12/31/2013 |
|---|---|---|---|
| **Current** | $218,918 (9%) | $199,746 (4%) | $2,002,502 (23%) |
| **0-30 Days Past Due** | $158,616 (6%) | $128,032 (3%) | $0 (0%) |
| **31-60 Days Past Due** | $118,000 (5%) | $170,379 (4%) | $19,782 (0.23%) |
| **61-90 Days Past Due** | $74,100 (3%) | $97,068 (2%) | $46,958 (0.55%) |
| **91-180 Days Past Due** | $668,189 (27%) | $30,595 (0.65%) | $339,893 (4%) |
| **Over 180 Days Past Due** | $671,968 (27%) | $2,799,547 (60%) | $4,625,179 (54%) |
| **Unknown** | $592,132 (23%) | $1,218,406 (26%) | $1,469,912 (17%) |
| **Total** | **$2,501,923 (100%)** | **$4,643,773 (100%)** | **$8,504,226 (100%)** |

87.     Concealing the dire financial circumstances of AGF LLC, and therefore of AGF

II, the monthly account statements to investors showed "total balances" – essentially, notional

amounts – without any disclosure of AGF II's inability to repay investors.  For example, as of

December 31, 2011, 2012 and 2013, AGF II's monthly statements represented to investors that

20

their total balances amounted to $1,087,170.68, $4,184,472.15 and $9,204,121.56, respectively. In order for AGF II to be able to pay all of these balances, AGF LLC would not only have had to collect all of its current and less than 90 day overdue loans, but it would also have had to collect 27 percent of its unknown and 90-day overdue loans in 2011, 89 percent of those loans in 2012, and more than 100 percent of those loans in 2013, and direct all of those loan payments to AGF II exclusively, and not to AGF I or AGF III.  Given the overwhelming percentage of delinquent and uncollectible loans in 2011, 2012 and 2013, AGF II could not possibly have done so.

88.    Because the value of AGF II's loan portfolio was nowhere near the total balances represented on investors' account statements, AGF II overstated by far in those statements the actual value of their investments.

89.    Johnson directly communicated with AGF LLC's debtors; he knew, or recklessly disregarded, the status of their loans; and, therefore, he knew, or recklessly disregarded, that the account statements misleadingly represented the value of each investor's account when they were provided to each investor and that such information was material to the investors.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5(a), (b) and (c) Thereunder
(Against AGF II, PAA, Johnson and Allen)**

90.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 89, as though fully set forth herein.

91.    By reason of the foregoing, AGF II, PAA, Johnson and Allen, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have:  (a) employed devices, schemes and

artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

92.     By reason of the foregoing, AGF II, PAA, Johnson and Allen, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

### SECOND CLAIM FOR RELIEF
#### Violations of Sections 17(a)(1), (2) and (3) of the Securities Act
#### (Against AGF II, PAA, Johnson and Allen)

93.     The Commission re-alleges and incorporates by reference paragraphs 1 through 89, as though fully set forth herein.

94.     By reason of the foregoing, AGF II, PAA, Johnson and Allen, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in the offer or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities offered and sold by AGF II, PAA and other persons.

95.     By reason of the foregoing, AGF II, PAA, Johnson and Allen violated, and unless

enjoined will continue to violate, Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C.

§§ 77q(a)(1), (2) and (3)].

## THIRD CLAIM FOR RELIEF
### Control Person Liability for AGF II's Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)
### Thereunder and Sections 17(a)(1), (2) and (3) of the Securities Act
### (Against Johnson)

96.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 95, as though fully set forth herein.

97.     At all times relevant hereto, Johnson, directly or indirectly, controlled AGF II for

the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

98.     By engaging in the conduct alleged above, Johnson is liable as a control person

for AGF II's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-

5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a)(1), (2) and

(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

## FOURTH CLAIM FOR RELIEF
### Control Person Liability for PAA's Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5(a), (b) and (c) Thereunder
### and Sections 17(a)(1), (2) and (3) of the Securities Act ·
### (Against Allen and Wasserman)

99.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 95, as though fully set forth herein.

100.    At all times relevant hereto, Allen and Wasserman, directly or indirectly,

controlled PAA for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

101.    By engaging in the conduct alleged above, Allen and Wasserman are liable as

control persons for PAA's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5] and Sections 17(a)(1), (2) and

(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for AGF II's Violations
of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)
Thereunder and Sections 17(a)(1), (2) and (3) of the Securities Act
(Against Johnson, Allen and Wasserman)

102.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 95.

103.    As alleged above, AGF II violated Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and

Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

104.    Johnson, Allen and Wasserman knew, or recklessly disregarded, that AGF II's

conduct was improper and knowingly rendered to AGF II substantial assistance in this conduct.

105.    By reason of the foregoing, Johnson, Allen and Wasserman aided and abetted,

and unless enjoined will continue to aid and abet, AGF II's violations of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. §

240.10b-5(a), (b) and (c)] and Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§

77q(a)(1), (2) and (3)].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Johnson's Violations
of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)
Thereunder and Sections 17(a)(1), (2) and (3) of the Securities Act
(Against Allen and Wasserman)

106.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 95.

107.    As alleged above, Johnson violated Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and

Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

108.    Allen and Wasserman knew, or recklessly disregarded, that Johnson's conduct was improper and knowingly rendered to Johnson substantial assistance in this conduct.

109.    By reason of the foregoing, Allen and Wasserman aided and abetted, and unless enjoined will continue to aid and abet, Johnson's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for PAA's Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) Thereunder and Sections 17(a)(1), (2) and (3) of the Securities Act (Against Allen and Wasserman)

110.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95.

111.    As alleged above, PAA violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

112.    Allen and Wasserman knew, or recklessly disregarded, that PAA's conduct was improper and knowingly rendered to PAA substantial assistance in this conduct.

113.    By reason of the foregoing, Allen and Wasserman aided and abetted, and unless enjoined will continue to aid and abet, PAA's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Liability for Allen's Violations
of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c)
Thereunder and Sections 17(a)(1), (2) and (3) of the Securities Act
(Against Wasserman)**

114.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95.

115.    As alleged above, Allen violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

116.    Wasserman knew, or recklessly disregarded, that Allen's conduct was improper and knowingly rendered to Allen substantial assistance in this conduct.

117.    By reason of the foregoing, Wasserman aided and abetted, and unless enjoined will continue to aid and abet, Allen's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)] and Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

#### I.

Permanently enjoining AGF II, PAA, Johnson, Allen and Wasserman from committing and/or aiding and abetting the violations of the federal securities laws alleged against them in this complaint;

#### II.

Ordering AGF II, PAA, Johnson and Allen to disgorge the ill-gotten gains received as a

result of the violations alleged in this complaint, and ordering each of them to pay prejudgment interest thereon;

### III.

Ordering AGF II, PAA, Johnson, Allen and Wasserman to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

### IV.

Granting such other and further relief as the Court may deem just and proper.

Dated:  February 3, 2016
         New York, New York

Andrew M. Calamari
Sanjay Wadhwa
Gerald A. Gross
Alexander M. Vasilescu
John W. R. Murray
Karen M. Lee
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0178 (Vasilescu)
vasilescua@sec.gov