UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SECURITIES & EXCHANGE
COMMISSION,

      Plaintiff,

  v.

AMERICAN GROWTH FUNDING II, LLC,
PORTFOLIO ADVISORS ALLIANCE, INC.,
RALPH C. JOHNSON,
HOWARD J. ALLEN III, and
KERRI L. WASSERMAN

      Defendants.
-----------------------------------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/4/18

16-CV-828 (KMW)

**OPINION AND ORDER**

KIMBA M. WOOD, United States District Judge:

  The Securities and Exchange Commission ("SEC" or "the Commission") brought this action against American Growth Funding II and Ralph C. Johnson ("the AGF II Defendants") and Portfolio Advisors Alliance, Howard J. Allen III, and Kerri L. Wasserman ("the PAA Defendants") (collectively, "the Defendants") for securities fraud under Section10(b) of the Exchange Act and Rule10b-5 thereunder, and Sections 17(a)(1), (2), and (3) of the Securities Act. The SEC filed motions *in limine* on August 8, 2018 (ECF No. 166), and the AGF II Defendants filed motions *in limine* on August 9, 2018 (ECF No. 168). This Court's rulings on these motions are stated below.

**I. RULINGS**

  **A. SEC Motions *in Limine***

    1. <u>Motion I: Evidence Related to Investor Losses and Profits</u>

  The SEC first seeks to exclude evidence related to the pecuniary losses (or profits) of AGF II investors because such evidence is irrelevant. (SEC Mem. Supp., ECF No. 167, at 4–5.) This is so, according to the SEC, because the Commission need not demonstrate the AGF II

1

investors suffered a monetary loss to succeed in this enforcement action. (*Id.*) The question here is whether the Defendants defrauded the AGF II investors through material misrepresentations, not whether those misrepresentations resulted in monetary injury to the AGF II investors. (*Id.*) Apart from the irrelevance of evidence related to investor loss, the SEC also argues such evidence will confuse the jury and "improperly inject issues of causation into the case." (*Id.* at 5.) Finally, the SEC contends evidence of investor loss would be prejudicial by suggesting any misrepresentation was not material because "these victims 'made out well.'" (*Id.*)

In response, the Defendants contend evidence of investor loss is relevant to scienter. (AGF II Defs. Mem. Opp'n, ECF No.174, at 3 ("Whether investor funds have been misused, misappropriated, or losses have been incurred is directly relevant to the mental state of the defendants at the time the alleged misrepresentations were made."); PAA Defs. Mem. Opp'n, ECF No. 172, at 20 ("[T]he fact that this was not a scheme to defraud investors, but rather, a legitimate investment in which no investors lost any of their investment, also goes to the issue of whether the PAA Defendants intended to harm investors.").) The Defendants further argue evidence of investor loss is relevant to materiality. (AGF II Defs. Mem. Opp'n at 2 ("[I]nvestor profits are directly relevant to [the] issue[] of materiality."); PAA Defs. Opp'n at 20 ("[T]he fact that investors did not incur any losses—and in fact, profited off the transaction—is relevant to the total mix of information that a reasonable investor would be interested in knowing in deciding whether to invest").) Finally, the AGF II Defendants assert that "evidence regarding investor profits/losses is directly relevant to the Court's determination as to the appropriate level of penalties to be imposed." (AGF II Defs. Mem. Opp'n at 3.)

This Court agrees with the SEC that the monetary losses or profits of AGF II investors are not relevant. The enforcement action here is similar to that in *In re Reserve Fund Securities*

2

*and Derivative Litigation*, No. 9-CV-4346 (PGG), 2012 WL 12354220, at *1–2 (S.D.N.Y. Sept. 11, 2012) (Gardephe, J.), in which the court rejected the defendants' attempts to present evidence showing "investors recouped most of their investment . . . . [b]ecause investor loss is irrelevant to the jury's resolution of the Commission's claims, [and] evidence and argument concerning this subject is likewise irrelevant." This reasoning is compelling. The SEC does not need to demonstrate investor loss to succeed on its claims. "[I]n an enforcement action, civil or criminal, there is no requirement that the government prove injury, because the purpose of such actions is deterrence, not compensation." *SEC v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012); *see also SEC v. Kelly*, 765 F. Supp. 2d 301, 319 (S.D.N.Y. 2011) (McMahon, J.) ("[U]nlike a private plaintiff, the SEC need not allege or prove reliance, causation, or damages in an action under Section 10(b) or Rule 10b–5." (citing *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 490–91 (S.D.N.Y. 2002)). Investor losses or profits are thus irrelevant.

Moreover, exclusion of evidence related to investor losses or profits comports with the "major congressional policy behind the securities laws in general, and the antifraud provisions in particular," which is "the protection of investors who rely on *the completeness and accuracy of information* made available to them." *Chris-Craft Indus. v. Piper-Aircraft Corp.*, 480 F.2d 341, 363 (2d Cir. 1973) (emphasis added). Indeed, the SEC brings enforcement actions to deter fraudulent misrepresentations and omissions, thus ensuring investors are provided the information needed to make informed investment decisions. Put another way, the harm to be deterred is not pecuniary—it is informational. *See United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) ("[I]nsofar as [defendants] intended to deprive investors of the 'full information' they needed to 'make refined, discretionary judgments,' they intended to harm the investors." (quoting *United States v. Rossomando*, 144 F.3d 197, 201 n.5 (2d Cir. 1998))).

The Defendants' arguments, which attempt to show investor profits are relevant to scienter, materiality, and civil penalties, are not persuasive. Each argument is addressed below.

i. Scienter

The Defendants first argue evidence of investor profits is relevant to scienter because the fact that investors profited suggests that the Defendants did not intend to 'harm' the investors. (*See* PAA Defs. Mem. Opp'n at 20; AGF II Defs. Mem. Opp'n at 3.) This argument, however, conflates intent to cause investors *pecuniary* harm and intent to *mislead* investors by depriving them of full information. The SEC need demonstrate scienter only as to the latter to succeed in its enforcement action. *See Abrahamson v. Flescher*, 568 F.2d 862, 878 n.27 (2d Cir. 1997) ("Scienter does not require a showing of intent to cause a loss to a plaintiff" (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 192 n.39 (1963)). Investor profits are not relevant to whether the Defendants intended to deprive investors of material information. This argument therefore fails.

ii. Materiality

The Defendants next argue evidence of the profits investors ultimately realized is relevant to the materiality of earlier misrepresentations. (*See* PAA Defs. Mem. Opp'n at 20; AGF II Defs. Mem. Opp'n at 2.) This contention is plainly wrong. "Materiality is determined *in light of the circumstances existing at the time the alleged misstatement occurred.*" *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 165 (2d Cir. 2000) (emphasis added); *see also Spielman v. Gen. Host Corp.*, 402 F. Supp. 190, 194 (S.D.N.Y. 1975) (Weinfeld, J.) ("The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20–20 hindsight view long after the event."). Whether investors later did or did not profit was not known at the time of the alleged misrepresentations, and therefore this fact is not relevant to the materiality of

4

the misrepresentations at the time they were made. *See Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843 (2d Cir. 1952) (concluding an overstatement of earnings in a quarterly report was not rendered immaterial simply because in the end "profits for the year as a whole were substantially unaffected by the overstatement").

Furthermore, allowing evidence of subsequent investor profits to color the materiality analysis would—as touched on above—undermine the "major congressional policy" behind the antifraud provisions, which is safeguarding "the completeness and accuracy of information made available to [investors]." *Chris-Craft*, 480 F.2d at 363. If Congress intended to target only those fraudulent misrepresentations resulting in a monetary loss, it would have required the SEC to show loss causation. Congress did not do so. *See Apuzzo*, 689 F.3d at 212 ("[I]n an enforcement action, civil or criminal, there is no requirement that the government prove injury, because *the purpose of such actions is deterrence*, not compensation." (emphasis added)).

In an attempt to salvage their materiality argument, the AFG II Defendants cite *United States v. Forbes*, 249 F. App'x 233, 237 (2d Cir. 2007), in which the Second Circuit held that "investor losses were probative on the issue of materiality." But the "investor losses" referenced in *Forbes* related to a precipitous decline in the stock price of Cendant Corporation that immediately followed a public disclosure of its "accounting irregularities." *United States v. Forbes*, No. 3:08-CV-933 (JBA), 2009 WL 1011475, at * 1 (D. Conn. Apr. 15, 2009). In the context of public filings, it is well-established that movement in stock price shortly after disclosure of a misrepresentation (or lack of the same) is some evidence of materiality. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 433 (S.D.N.Y. 2015) (McMahon, J.) ("Stock price movement is some evidence of materiality, but it is not in and of itself conclusive"). In such cases, however, there is a close proximity in time between disclosure

of the misrepresentation to investors and the movement in stock price. A decline in stock price soon after the disclosure of a misrepresentation suggests the misrepresentation *mattered* to investors. In the same vein, the absence of stock price movement soon after disclosure of a misrepresentation suggests the misrepresentation was *not* material to investors. But that is not what the Defendants contend in this case. Here, the Defendants argue investor profits realized long after the alleged misrepresentations are relevant to materiality. *Forbes* does not support this proposition.

This Court thus rejects the Defendants' materiality argument that subsequent investor profits are relevant to earlier misrepresentations.

iii. Civil Penalties

Finally, the AGF II Defendants contend evidence of investor profits and losses is relevant to the determination of appropriate civil penalties. (AGF II Defs. Mem. Opp'n at 3.) This argument is correct, but beside the point. The jury determines liability. The court determines penalties. *See* 15 U.S.C. § 78u(d)(3) ("The amount of the penalty shall be determined by the court."); *SEC v. Castaldo*, No. 8-CV-8397 (JSR), 2009 WL 2591376, at *1 (S.D.N.Y. Aug. 19, 2009) (Rakoff, J.) ("The jury was not asked to determine the relief warranted by these determinations of liability, because, as both sides agreed, the relief here sought by the SEC . . . is allocated by statute to determination by the Court, as in the case of civil money penalties." (citing 15 U.S.C. § 78u(d)(3)).

\*\*\*

This Court therefore GRANTS the motion. No evidence related to investor loss or profit will be admitted at trial, and no argument concerning this subject will be permitted.

2. Motion II: Evidence Related to Reliance on and Involvement of Counsel

6

The SEC next moves to exclude evidence related to the involvement of or reliance on counsel because, according to the SEC, the Defendants have not proffered sufficient evidence to warrant a reliance on advice of counsel jury instruction. (SEC Mem. Supp. at 11.) The SEC argues that because the Defendants cannot establish an advice of counsel defense, this Court should exclude "*any* evidence or argument that counsel was 'involved' or 'present' in the PPM preparation or amendment process" because such evidence would be "unduly and irreparably prejudicial." (*Id.* at 14–15 (emphasis in original).) In response, the PAA Defendants argue there is compelling evidence in the record to support their reliance on the advice of counsel defense. (PAA Defs. Mem. Opp'n at 7–13.)[1] The PAA Defendants also contend exclusion of any evidence related to the reliance on and involvement of counsel is premature. (*Id.* at 16–19.)

As an initial matter, this Court is not persuaded the SEC's motion is appropriate for resolution at this stage of the litigation. The SEC argues "courts do not hesitate to preclude a jury from hearing evidence about advice of counsel where there is insufficient evidence to ground the claim." (SEC Mem. Supp. at 13–14.) However, none of the decisions the SEC cites to support this proposition actually does so. In fact, the decisions the SEC cites support the *contrary* conclusion—that is, courts routinely allow the jury to hear evidence about interactions with and advice of counsel even if ultimately there is insufficient evidence for an advice of counsel instruction. For example, the SEC cites *United States v. Hill*, 643 F.3d 807, 850-51 (11th Cir. 2011), in which the Eleventh Circuit affirmed the district court's refusal to give an advice of counsel instruction because *the evidence presented at trial, including testimony from several of the involved attorneys*, did not support the instruction. Similarly, the SEC cites *United States v. Travers*, 114 F. App'x 283, 288 (9th Cir. 2004), in which the Ninth Circuit affirmed the

---

[1] The AGF II Defendants take no position as to the evidence related to the reliance on and involvement of counsel. (*See* AGF II Defs. Mem. Opp'n at 8.)

district court's refusal to give an advice of counsel instruction because *the defendant's testimony at trial as to his interactions with counsel* was insufficient to support the instruction. Thus, not only do *Hill* and *Travers* fail to support the contention that "courts do not hesitate to preclude a jury from hearing evidence about advice of counsel," both decisions are at odds this contention.[2]

The SEC next argues that a blanket pre-trial exclusion is warranted because the Defendants "have not and cannot set forth any evidence to establish any of the four elements of the [reliance on counsel] defense." (SEC Mem. Supp. at 11.) To be entitled to the reliance on the advice of counsel defense, the PAA Defendants must show that they "made a complete disclosure to counsel, sought advice as to the legality of [their] conduct, received advice that [their] conduct was legal, and relied on that advice in good faith." *Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir. 1994) (citing *SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981)).

The SEC is wrong. The SEC states that with respect to Timothy Kahler, the attorney the PAA Defendants engaged in 2013:

> [T]here is no testimony or documentary evidence showing that anyone disclosed to Kahler the inaccuracy of the audit representations in the 2011 and 2012 PPMs or that PAA was continuing to sell AGF II units despite the PAA Defendants' knowledge of the falsity of the PPMs. As a result, Kahler never advised that AGF II or PAA could continue selling securities using an inaccurate PPM, or that either could fail to tell previous AGF II investors that the PPM was inaccurate.

(SEC Mem. Supp. at 13.) This is inaccurate. As the PAA Defendants point out, Allen testified as follows in his declaration:

> In late September 2013, after learning that AGF II had not retained Citrin Cooperman to perform an audit, I reached out to Timothy

---

[2] The SEC also cites *SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) (Forrest, J.), and *SEC v. Mapp*, No. 16-CV-246, 2017 WL 8780604 (E.D. Tex. Dec. 04, 2017). The defendants in both of these cases presented little, if any, evidence to support a reliance on the advice of counsel defense. As explained below, the same is not true here.

8

> Kahler, Esq., from the law firm Troutman Sanders LLP to advise PAA (including myself) how to proceed. Mr. Kahler had previously represented PAA and I knew and respected him and his firm
>
> *To be clear, I contacted Mr. Kahler for the specific purpose of obtaining legal advice regarding what PAA and its registered representatives had to do since AGF II had not yet performed an audit.* Mr. Kahler was provided with a copy of the 2012 PPM (including, specifically, the audit language contained therein) and he was also specifically informed that as of September 2013, no audit had been performed. I also informed Mr. Kahler that any other document that he needed to review would be provided to him, as I am not familiar with what he needed to perform a review and form conclusions on how to proceed. After reviewing the documents he sought and received, Mr. Kahler informed me that this was an "easy fix," explaining that if AGF II received consent from over 50% of the investors, the Operating Agreement could be amended to dispense with the audit requirement completely.
>
> Upon receipt of Mr. Kahler's explicit advice and instruction on how to proceed, PAA sent correspondence to its top fifteen investors seeking consent to amend the Operating Agreement. After receiving two objections from investors we informed Mr. Kahler, who then advised that the 2012 PPM need *not* be revised since there would be no amendment to the Operating Agreement, but that AGF II should perform an audit.
>
> PAA immediately informed Mr. Johnson of Mr. Kahler's legal advice and, in November 2013, Mr. Johnson sent an email to me confirming that he had hired Evangelista and Co., CPA, ("Evangelista") to complete the audits from the previous two years. Accordingly, *at Mr. Kahler's direction and instruction*, PAA forwarded an email to AGF II to inform the fifteen investors that AGF II hired Evangelista to perform the audit.

(PAA Defs. Mem. Opp'n at 8–9 (emphasis in original).) The SEC may view Allen's testimony as self-serving and uncorroborated, but that argument goes to the *weight* of the evidence, not its admissibility. *See United States v. Scully*, 877 F.3d 464, 475 (2d Cir. 2017) ("One party to a trial will frequently believe that testimony offered by the other side is false or misleading. That, however, is not a factor to be weighed against the receipt of otherwise admissible testimony.")

9

The SEC advances a similar argument with respect to Andrew Russell, the attorney the PAA Defendants engaged in 2011. (SEC Mem. Supp. at 11–12.) Based on Russell's deposition testimony, the SEC argues Russell was asked to conduct a superficial review of the 2011 PPM—akin to a proofread—and not to provide legal advice as to the content of the document. (*Id.* at 12.) The SEC also argues that the Defendants' disclosures were deficient—that they did not "completely disclose . . . that there was any issue, let alone any inaccuracy, with the audit representations in the drafts or the final 2011 PPM." (*Id.* at 11–12.)

But, as the PAA Defendants again point out, Allen testified that Russell was tasked with reviewing the entire 2011 PPM, and Allen stated Russell "was hired specifically for that purpose." (PAA Defs. Mem. Opp'n at 7–8.) Russell himself testified that his firm was engaged to "prepare private placement documents" for AFG II. (PAA Defs. Mem. Opp'n 8.) The PAA Defendants also contend the 2011 PPM fully disclosed to Russell that AFG II was a newly formed entity and, as such, AGF II could not possibly have been audited in previous years. For example, although the 2011 PPM states "annual financial statements will continue to be audited," it also states:

> The Company and the Manager are newly formed entities with no operating histories, and, accordingly, *no performance histories to which a potential Investor may refer in determining whether to invest in the Company.* The Company's prospects must be considered in light of the risks, expenses and difficulties frequently encountered by new ventures, including the reliance of the Company on the Manager and its key personnel and other factors.

(PAA Defs. Mem. Opp'n at 11 (emphasis in original).) Whether these facts support an advice of counsel defense is a question for the fact-finder.[3]

---

[3] Regardless of whether the PAA Defendants are entitled to a reliance on counsel instruction, they also argue evidence related to their interactions with counsel is admissible because that evidence is relevant to scienter, an element the SEC must establish to succeed in this enforcement action. (PAA Defs. Mem. Opp'n at 13–16). Relevance, however, is not sufficient. This Court must also weigh the probative value of the evidence against its

In sum, this Court views exclusion of evidence related to reliance on counsel to be premature at this stage of the litigation. This Court therefore DENIES the motion. It does so, however, without prejudice.

The SEC also moves for an evidentiary hearing in the event the Court denies its motion to exclude. (SEC Mem. Supp. at 15 n.11.) The SEC argues an evidentiary hearing is "required to determine whether the Defendants can, in fact, establish the factual predicates" to assert a reliance on the advice of counsel defense. (*Id.*) As explained above, however, the Defendants have offered an evidentiary foundation for the defense. An evidentiary hearing would also not be useful given that resolution of the disputed issues requires determinations of credibility.

3. Motion III: Evidence Related to the Actions of the SEC

The SEC next moves to exclude evidence related to the "unclean hands" and Privacy Act violation affirmative defenses this Court previously struck from the AGF II Defendants' answer. (SEC Mem. Supp. at 6–7.) Specifically, the SEC seeks to exclude evidence related to "a supposed 'undercover operation' by two staff accountants from the SEC's Broker-Dealer Inspection Program and [] supposed false statements to witnesses by SEC Division of Enforcement attorneys." (*Id.* at 6.) This Court agrees with the SEC that evidence related to the stricken affirmative defenses is not relevant to any issue at trial. No evidence concerning the alleged "unclean hands" or Privacy Act violations will be permitted at trial.

The SEC also appears to make a far broader argument: that *any* evidence of its own actions should be precluded because such evidence simply "repackages" the stricken affirmative

---

potential prejudicial impact. If the PAA Defendants did not make a full disclosure to counsel, did not seek advice as to the legality of their conduct, did not receive advice that their conduct was legal, or did not rely on that advice in good faith—that is, if the PAA Defendants do not satisfy any of the requisite elements for a reliance on counsel instruction—the probative value (as to scienter) of the evidence related to interactions with counsel is significantly less and the potential for prejudice is significantly more.

11

defenses and is irrelevant and prejudicial. (SEC Mem. Supp. at 8–10.)[4] But the SEC mentions evidence of only one of its actions: subpoenaing the accounting firm Frazier & Evangelista (F&E). (*Id.* at 5–6.) Apart from that subpoena, the SEC does not explain which of its other actions are at issue. A blanket exclusion would thus be premature at this stage. The Court addresses the subpoena question below.

The SEC seeks to preclude evidence showing the Defendants originally engaged F&E to perform the needed audits, but F&E reneged on the agreement after receiving a subpoena from the SEC. (*Id.*) The SEC contends "there is not even an attenuated connection between *the reason* one auditor did not conduct an audit and *the quality of* an audit performed by *an entirely different* auditor." (SEC Reply Mem Supp. at 5.) This argument confuses the issues. Even if the reason F&E decided not to perform the audits is not relevant to the quality of the audits Weinberg performed, the reason the Defendants turned to Weinberg to begin with is relevant to their scienter. The fact that the Defendants originally retained F&E to perform the needed audits undermines the inference that the Defendants intentionally sought out an unscrupulous auditor and chose Weinberg for that reason. The SEC makes no argument to the contrary.

Furthermore, in both its complaint and summary judgment motion, the SEC argues an October 2018 email sent to investors, which stated audits were "being done" by F&E, contained fraudulent misrepresentations. (SEC Summ. J. Mot., ECF No. 120, at 9.) Specifically, the SEC argues F&E "never agreed to perform an audit for AGF II nor did it ever conduct any audit work for AGF II." (*Id.*) Thus, the nature and extent of the relationship between F&E and the Defendants is directly relevant to whether the October 2018 statement that audits were "being

---

[4] The SEC cites a number of cases that stand for the uncontroversial proposition that the collateral consequences of an SEC enforcement action—including monetary and reputational harm to businesses or individual defendants—is irrelevant and prejudicial. (SEC Mem. Supp. at 8–10.) These cases do not hold, however, that any and all actions the SEC undertakes are irrelevant and prejudicial.

done" by F&E was false. The receipt of a subpoena, which the Defendants argue led F&E to back away from their agreement, is highly probative of the answer to this question. The subpoena could explain, for example, the reason F&E might have agreed to perform the audits and then abruptly changed course.

But this Court also recognizes the potential for prejudice and the need to balance this potential against the relevance of the evidence. Therefore, although this Court will permit the Defendants to introduce evidence of the fact of a subpoena, the Defendants will not be allowed to introduce evidence showing the subpoena came *from the SEC*. Receipt of a subpoena is relevant, to the extent it motivated F&E to decline to perform an audit of AGF II. But the source of the subpoena is of minimal relevance, and any relevance is substantially outweighed by the risk of prejudice.

In sum, to the extent the SEC seeks to preclude evidence introduced to show "unclean hands" or Privacy Act violations, its motion is GRANTED. To the extent the SEC seeks to preclude any evidence related to its own actions, its motion is DENIED as premature. The SEC has not explained what actions are at issue. The SEC is free to renew its objections to particular evidence at trial.

**B.     AGF II Defendants' Motions *in Limine***

1.     Motion I: Evidence Related to the Devor Supplemental Export Report

The AGF II Defendants first move to exclude portions of the supplemental expert report prepared by Harris L. Devor. (AGF Defs. Mem. Supp., ECF No. 167, at 2.)[5] The AGF II Defendants advance a number of arguments in support of that motion, although many of them

---

[5] The AGF II Defendants also move to exclude portions of the original Devor expert report. This Court already denied the AGF II Defendants' motion to exclude portions of the original report, *see SEC v. Am. Growth Funding II*, 2018 WL 1135564, and the AGF II Defendants offer no reason for this Court to revisit its earlier decision.

13

are not clear or developed. This Court views four arguments as appropriate for resolution. Those arguments are addressed below.

### i. Materiality of an Audit

The AGF II Defendants argue Devor addressed the materiality of an audit to investors "without any basis for the testimony." (AGF II Defs. Mem. Supp. at 6.) Devor stated the following:

> [I]n the absence of an audit conducted, and related audit report prepared, in accordance with GAAS, investors may be left with no assurance beyond that presented by management itself that the financial information presented in subject financial statements materially conforms with GAAP and is, therefore, free from material misstatements or misrepresentations.

(Devor Suppl. Expert Rep., ECF No. 162-2, at ¶ 9.) The AGF II Defendants contend that whether an audit is important to an investor is a factual question for the jury, and therefore Devor should be precluded from testifying on this point. (AGF II Defs. Mem. Supp. at 6.) This argument is not persuasive. Although an expert "may not give testimony stating ultimate legal conclusions," he "may opine on an issue of fact within the jury's province." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). This is precisely what Devor does in the quoted passage of his supplemental report. Furthermore, as this Court previously concluded, Devor's anticipated testimony as to the importance of an audit "will help the jury understand why an investor would want to know that a company has had its financials audited." *SEC v. Am. Growth Funding II*, 2018 WL 1135564, at *2.

To the extent the AGF II Defendants move to preclude Devor from testifying as to the materiality of an audit to investors, their motion is DENIED.

### ii. Ability of AGF to Repay its Loans

14

The AGF II Defendants next contend Devor "provides a completely inappropriate opinion as to whether AGF LLC could repay its loans, a conclusion far beyond his assignment as an expert on auditing procedures [] while he admits to no expertise in running a business like AGF's business." (AGF II Mem. Supp. at 7.) This argument is also unpersuasive. It is well within the purview of an auditor (or accountant) to evaluate accounts receivable, including outstanding loans. Such an evaluation is necessary to determine the accuracy and completeness of the financial statements provided to investors. Devor is thus qualified to opine as to whether AGF could repay its loans. *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (Leisure, J.) (concluding a certified public account with seventeen years of experience was qualified to testify as to accounts receivable). The AGF II Defendants may challenge Devor's familiarity with "running a business like AGF's business," but this dispute goes to the weight, not the admissibility of the testimony. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043–1044 (2d Cir. 1995) (rejecting a challenge to the testimony of a qualified expert as to the "breathing zone" of glue fumes, notwithstanding the expert's alleged lack of "academic training in fume dispersal and air quality studies," which was "properly explored on cross-examination").

To the extent the AGF II Defendants seek to exclude testimony as to whether—in Devor's expert opinion—AGF could repay its loans, their motion is DENIED.

iii. Credibility of Defendant Johnson

The AGF II Defendants next argue Devor improperly commented on the credibility of Defendant Johnson in two passages of the supplemental expert report. (AGF II Defs. Mem. Supp. at 7.) First, the AGF II Defendants point to Devor's conclusion that "Johnson had never previously prepared the required analysis to determine the quality, performance and collectability

15

of AGF LLC's loans to third parties in accordance with GAAP." (Devor Suppl. Expert Rep. ¶ 42.) In this passage, however, Devor is not commenting on Johnson's credibility, but instead stating that Johnson (and by extension AGF II) did not analyze their doubtful accounts in a way consistent with GAAP. Devor is qualified to testify as to this opinion.

Second, the AGF II Defendants contend Devor impugns Johnson's credibility in concluding "Johnson's assertions in deposition regarding the nature of the allowance recorded and the related collectability of AGF LLC's loans to third parties are unfounded." But whether a statement lacks credibility is separate from whether it lacks a factual foundation. In this passage, Devor is commenting on whether a conclusion is supported by the facts, and this is properly the subject of expert testimony.

This Court therefore DENIES the motion to exclude the cited passages of the supplemental report.

iv. Testimony of Lawrence Meril

Finally, the AGF II Defendants argue Devor relies on "inadmissible testimony of non-party witnesses" and "hearsay." (AGF II Defs. Mem. Supp. at 4.) The hearsay arguments the AGF II Defendants advance are vague and conclusory. The AGF II Defendants do not point to specific passages in the supplemental report as examples of inadmissible hearsay. Notwithstanding that lack of specificity, the Court notes that Devor's references to the deposition testimony of Lawrence Meril, who performed an audit of AGF II's 2015 financial statements, are inadmissible hearsay.

"Experts can testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (quoting *United States v. Locascio*, 6 F.3d 924, 938

(2d Cir. 1993)). "The expert may not, however, simply transmit hearsay to the jury . . . . [but] must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials." *Id.* (quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003)). If the expert does not do so, he "is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows the Government to 'circumvent the rules prohibiting hearsay.'" *Id.* (quoting *Dukagjini*, 326 F.3d at 58–59).

Devor's references to the deposition testimony of Meril simply repeat Meril's hearsay testimony in an attempt to buttress Devor's expert opinion. For example, Devor states:

> In concurrence with my opinion, Mr. Meril testified that he determined Rotenberg Meril could not conduct an audit of the Company's financial statements in accordance with GAAS without evaluating the collectability of AGF LLC's receivables. (Meril, pp. 38-39). Mr. Meril further testified that, after obtaining an understanding of the operations of the Company and AGF LLC, he determined "on day one with the engagement letter" that it was necessary to "evaluate the status of the loans at AGF LLC" as a component of Rotenberg Meril's audit of the Company's 2015 financial statements. (Meril, p. 38). Indeed, Mr. Meril agreed with an assertion made by the Commission that Rotenberg Meril first had to audit AGF LLC before it could conclude its audit of the Company, as reflected in the following excerpt from Mr. Meril's deposition:
>
>> Q: First, you did the audit report for AGF LLC, right?
>>
>> A: That's correct.
>>
>> Q: And that's dated February 8th, 2018, right?
>>
>> A: Yes.
>>
>> Q: And then you did the audit report for AGF II for 2015, right?
>>
>> A: That's correct.
>>
>> Q: And did you do them in that order because before you could do the audit report for AGF II, you needed to figure out what the audit was going to be for the entity that made the loans?
>>
>> A: Correct.

17

> Q: Because one audit's results, AGF LLC's, those results would flow into the analysis for AGF II?
>
> A: Correct. It would impact our analysis.
>
> (Meril, p. 99).

(Devor Suppl. Expert Rep. ¶ 31.) Devor is not applying his expertise here, and he is not relying on hearsay evidence to form his own expert opinion. Instead, Devor is simply repeating hearsay testimony.[6] The SEC, of course, is free to elicit Meril's live testimony at trial.[7] It cannot, however, "circumvent the rules prohibiting hearsay" by having Devor repeat Meril's deposition testimony. *Mejia*, 545 F.3d 179, 197 (quoting *Dukagjini*, 326 F.3d at 59).

This Court therefore GRANTS the motion. The portions of the supplemental expert report that reference Meril's deposition testimony will not be admitted.

2. Motion II: Evidence Related to SEC Investigative Testimony[8]

The AGF II Defendants move to exclude as inadmissible hearsay sworn statements made to SEC investigators during their investigation. (AGF II Defs. Mem. Supp. at 8–10.) A blanket exclusion is inappropriate. The sworn statements qualify as hearsay only if offered to prove the truth of the matter asserted. *See* Fed. R. Evid. (801)(c)(2). It is not yet clear for what purpose the statements will be offered. For example, if a statement is used to impeach a witness or to refresh a witness's recollection, it may be admissible. *See* Fed. R. Evid. 801(d)(1), 803(5). The Court also notes that two of the transcripts the AGF II Defendants seek to exclude are transcripts of testimony from the AGF II Defendants' codefendants, Howard Allen and Kerri Wasserman.

---

[6] Although only one example is provided here, this Court has reviewed all of the references to Meril's deposition testimony in the supplemental expert report and finds each reference suffers from the same flaw.

[7] This Court notes the SEC has not made any argument as to Meril's unavailability.

[8] The "investigative testimony" the AGF II Defendants refer to includes affidavits, declarations, and transcripts of sworn interviews the SEC obtained throughout the course of its investigation from both party and non-party witnesses.

Their testimony could be admissible on a number of different grounds, most obviously as statements of party opponents. *See* Fed. R. Evid. 801(d)(2)(A).

This Court therefore DENIES the motion without prejudice. The AGF II Defendants may renew their objections at trial if the SEC attempts to use testimony for an impermissible purpose.

### 3. Evidence Related to Previous Arrest, Charges and Acquittal

Finally, the AGF II Defendants seek to preclude the SEC from introducing "any evidence" related to Johnson's previous acquittal "for unrelated criminal charges." (AGF II Defs. Mem. Supp. at 10.) The SEC, however, contends exclusion would be premature because "the AGF Defendants have merely provided a conclusory one-paragraph statement without any additional details or documentation to clarify the exact nature of the circumstances of such alleged misconduct." (SEC Mem. Opp'n at 13.) In their reply, the AGF II Defendants do not mention the nature or circumstances of the previous arrest, the charges against Johnson, or his acquittal. Instead, the AGF II Defendants simply restate that "the SEC should be precluded from offering any evidence related to Mr. Johnson's years old arrest and acquittal." (AGF Reply Mem. Supp. at 5.)

This does not provide sufficient information for this Court to determine the admissibility of evidence related to Johnson's previous arrest, the charges against him, or his acquittal. This Court therefore agrees with the SEC that exclusion would be premature at this stage and DENIES the motion without prejudice.

## II. CONCLUSION

This Order resolves docket numbers 166 and 168.

SO ORDERED.

Dated: New York, New York
December 4, 2018

_____
KIMBA M. WOOD
United States District Judge