# Exhibit 1

Expert Report of Richard T. Chase dated March 3, 2017

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | X | |
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff | ) ) | **16 Civ. 828 (KMW)** |
| vs. | ) ) ) | **EXPERT REPORT OF RICHARD T. CHASE** |
| AMERICAN GROWTH FUNDING II, LLC, PORTFOLIO ADVISORS ALLIANCE, INC., RALPH C. JOHNSON, HOWARD J. ALLEN III, and KERRI L. WASSERMAN, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| | X | |

## I.    Introduction

The Securities and Exchange Commission ("Commission") has filed a complaint against

American Growth Funding II ("AFG II" or the "Company") and its Chairman and founder, Ralph C.

Johnson ("Johnson"), in connection with a private placement of securities. The complaint also names

Portfolio Alliance Advisors, Inc. ("PAA") and two of its principals, Howard J. Allen III ("Allen") and

Kerri Wasserman ("Wasserman") (collectively, the "PAA Defendants"). PAA acted as sales agent in the

sale of interest-bearing units of AFG II in the private placement. The Commission alleges that all of the

defendants committed fraud in connection with the sale of the units, among other things because the

Company failed to produce audited financial statements until its third year of operation.

## II.    Summary of Opinions

1

I have been engaged by the PAA Defendants to serve as a rebuttal witness to the opinions stated by the Commission's expert witness, Robert W. Lowry ("Lowry"), as they relate to the PAA Defendants. In regards to the PAA Defendants, Mr. Lowry opines:[1]

A. PAA and Allen failed to reasonably investigate red flags concerning the AGF II unit offering, including various conflicts of interest disclosed in the private placement memorandum ("PPM"), the nature of AGF II's lending activities, or the reasons for AFG II's to provide audited financial reports despite representations in the PPM that it had done so. Lowry alleges their actions also violated FINRA suitability rules.

B. PAA and Allen should have stopped selling the AGF II Offering once they learned that the PPM contained misstatements about past audits, and Wasserman, as PAA's Chief Compliance Officer, should have prevented Allen and other PAA salespersons from making those sales.

Contrary to Lowry's opinion, the evidence in this case demonstrates that Allen and other PAA personnel, assisted by counsel, engaged in extensive due diligence for at least a year before the AGF II private placement and were very familiar with the intended structure and operation of the Company. Potential conflicts arising from relationships between AGF II, PAA and their respective owners and management personnel, the nature of AGF II's lending activities, and the risk of investing in the AGF II units, were all clearly and prominently disclosed in the PPM. In the PPM, AGF II committed to have audited annual financial statements. Even though the PPM contained no time limitations on production of audited financials, once PAA became aware that audited financial statements had not been produced, PAA pressed Johnson and received assurances from him that audited financial statements would be prepared, and ultimately they were produced.     At no time is there any evidence in the record that PAA, Allen or Wasserman did not have a good faith view that audited financials would not be produced. I disagree with Lowry that sales of the units were per se unsuitable; regardless, the standards for

---

[1] Expert Report of Robert W. Lowry, February 3, 2017.

application of FINRA's suitability rule are not relevant to the Commission's anti-fraud charges in this case.

Lowry's opinion that sales by PAA of the AGF II units should have been suspended at some point in time hinges entirely on the conclusion that the PPM's statement about annual financial statements was false. This critical element of Lowry's opinion, indeed much of the Commission's anti-fraud case against the PAA Defendants, hinges on a single seven-word phrase buried on the last page of the PPM. Rather than simply noting that the Company intended to have audited financials, the PPM prefaced this intention with the phrase, "as has been policy in the past," an obviously incompatible statement for a newly formed entity that had no "past." Once the PAA Defendants learned that audited financials had not been produced, they pressed for, and received, assurance from Johnson that the financials would be audited. The PAA Defendants consistently believed that audited financials would be produced, and they in fact were. Issues related to the timeliness of production, and the notion that sales should have been suspended pending delivery of audited financials, ignore the time horizon of these investments, which were subject to a two-year lock-up. And, in fact, investors purchasing the units any time after late summer 2012 had audited financials they could reference in deciding whether to redeem their units.

After providing an analysis of the applicable laws, regulations and regulatory guidance for this case, and analyzing the facts of this case, I provide a more detailed rebuttal of Lowry's opinions.

## III.    Qualifications

My qualifications are set forth in the resume attached to this report as Appendix A. I have been a legal and compliance professional in the securities industry for forty years. Roughly a third of that time has been with regulatory or self-regulatory organizations, the rest in senior in-house positions in the industry and, for the past year and a half, as an industry consultant. Following graduation from Harvard Law School in Cambridge, Massachusetts in 1977, I joined the Securities & Exchange Commission, serving for nine years in positions of increasing responsibility in the Division of Market Regulation. In the years following my departure from the Commission, I served as the senior regulatory officer at two

3

securities exchanges, the Philadelphia and American Stock Exchanges. I have also held senior legal and compliance positions with several U.S. broker-dealers. I served as a Senior Vice President in charge of Equities Legal and Compliance for Lehman Brothers; as General Counsel for Wessels Arnold & Henderson, a Minneapolis an investment banking boutique; as General Counsel for U.S. Bancorp Piper Jaffray; and as Chief Compliance Officer and General Counsel for RBC Capital Markets, the U.S. broker-dealer arm of the Royal Bank of Canada. Following my retirement from RBC Capital Markets at the end of 2014, I assumed my current position as a Managing Director of Oyster Consulting, LLC, a Richmond-based financial services consulting firm. I currently serve as the outsourced Chief Compliance Officer for a small investment banking boutique specializing in private placements and advice to privately held companies.

The roles in which I have served, in a regulatory capacity at the Commission and stock exchanges, in in-house legal and compliance positions at a spectrum of broker-dealers, and as an industry consultant, have provided me broad exposure to issues relating to securities regulation, including matters of direct relevance to the underlying facts and legal and regulatory issues posed in this case. I began my career at the Commission as a staff attorney in the Office of the Chief Counsel of the Division of Market Regulation, and later as a staff attorney in the Branch of Over-the-Counter Regulation, in which I handled proposed rule changes from the National Association of Securities Dealers, the forerunner to the Financial and Regulatory Authority ("FINRA"). I was promoted into supervisory positions of increasing responsibilities over the next several years, first as a Branch Chief, then an Assistant Director, and finally Associate Director of the Division's Office of Self-Regulatory Oversight. That office was responsible for reviewing and acting on proposed rule changes from all of the stock and options exchanges, NASD, MSRB, and securities depositories and clearing agencies. In overseeing that office, which was comprised of over 30 attorneys, I had broad responsibility for reviewing, passing on, and where appropriate, rejecting hundreds of rule filings annually from the securities self-regulatory organizations. Those filings encompassed matters relating to the conduct of trading in the nation's securities markets, as well as

4

regulation of the conduct of broker-dealers and their personnel with respect to sales and trading practices, financial responsibility, personnel qualifications, and related matters.

After departing the Commission, I was hired as Executive Vice President of the Philadelphia Stock Exchange. In that role, I had responsibility over the Office of the General Counsel and Corporate Secretary, as well as the Surveillance, Examinations, Listings, and Audit departments. The Exchange had regulatory responsibility for overseeing both floor-based and "upstairs" broker-dealers. I served on the staff of the Philadelphia Stock Exchange from 1986-1990. A decade later, I held a similar role at the American Stock Exchange, serving as the Executive Vice President for Member Firm Regulation. In these positions, I managed substantial staffs of more than 50 and 100 legal and compliance professionals, respectively, including Enforcement departments that brought actions relating to violations of both self-regulatory organization and Commission rules, including cases in which fraud, manipulation and related charges were brought under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 thereunder.

Following my tenure at the Philadelphia Stock Exchange, I became a Senior Vice President and Senior Counsel at Lehman Brothers. Initially, my role was focused primarily on the firm's investment banking activities, administering the firm's Chinese wall and confidentiality policies. Subsequently, I was placed in charge of Legal and Compliance for the Equities Division. After eight years at Lehman Brothers, I moved to Minneapolis, where I became General Counsel of Wessels Arnold & Henderson, an investment banking boutique. Shortly after I arrived, it was acquired by Dain Rauscher (later, RBC Dain Rauscher), and after a short period of time there I became General Counsel of U.S. Bancorp Piper Jaffray, where I oversaw the Legal and Compliance functions of the firm. I returned to New York, and after my tenure at the American Stock Exchange, I joined RBC Capital Markets, where I served initially as Chief Compliance Officer and later as General Counsel. Each of the firms in which I have served in an in-house legal or compliance role has had a substantial Investment Banking department, including bankers actively involved in private placements of securities. Each of the firms also had retail operations for which I provided legal services or compliance oversight. On an ongoing basis throughout my career as an

in-house professional, I have had to grapple with scenarios that raised issues related to the adequacy of disclosures in prospectuses, private placement memoranda or other sales materials, investor solicitations, suitability of recommendations and potential conflict of interest issues.

After retiring from RBC Capital Markets at the end of 2014, I joined Oyster Consulting LLC ("Oyster") as a Managing Director in mid-2015. Oyster provides a variety of compliance, operations, systems, risk management and other consulting services to broker-dealers, investment advisers and other financial services firms. At Oyster, I have been involved in several engagements in which the firm has been retained to serve as an Independent Consultant or to provide consulting services to a respondent in connection with a FINRA or Commission enforcement action. Several of these matters have involved the deposit by customers and subsequent sale of unregistered low-priced securities. These engagements have required, among other things, in-depth review of private placement memoranda and other sales and disclosure materials in dozens of transactions involving private placements of unregistered securities.

Throughout my career, I have been active in industry professional organizations. While at the Philadelphia and American Stock Exchanges, I participated in the Intermarket Surveillance Group, serving for a time as its chairman ("ISG"). ISG is a regulatory coordinating body consisting of surveillance, legal and compliance staff of all of the U.S. stock and options exchanges, several U.S. futures exchanges, and a large number of foreign securities and derivatives markets. While serving in in-house positions, I was actively involved on several committees of the Securities Industry Financial Market Association ("SIFMA"). I served as a member, and also was appointed chair, of the SIFMA General Counsels and Bank Regulatory Committees. I also served on the Capital Markets Committee and Securities Technology Committee, as well as numerous ad hoc committees. Among others, I chaired an ad hoc committee that reviewed proposed modifications of Rule 144, which governs sales of unregistered securities. I have been a member for over 20 years of the National Society of Compliance Professionals ("NSCP"), the largest non-profit organization dedicated to securities industry compliance matters. I served on NSCP's Board of Directors for nine years, including two terms as Chairman. I am frequently asked to speak on securities legal and compliance matters, and over the past 35 years have spoken at

6

literally dozens of SIFMA Compliance & Legal Seminars, NSCP national and regional meetings and other securities industry conferences on a wide variety of legal and compliance topics.

Oyster provides compliance consulting and related services, but does not provide legal services. I am a former member of the District of Columbia and Pennsylvania bars, but no longer am an active member of the bar. I have previously held Series 4, 7, 14 and 24 FINRA licenses. As the outsourced Chief Compliance Officer for a FINRA member firm, my Series 4, 7 and 24 licenses are currently active.

This engagement is the first occasion in which I have been retained as an expert witness.

## IV.    My Engagement

On or about February 17, 2017, I was engaged by three of the defendants, Portfolio Advisors Alliance, Inc. ("PAA"), Howard J. Allen III ("Allen") and Kerri L. Wasserman ("Wasserman") (collectively, the "PAA Defendants"), to provide expert services in connection with this Commission enforcement action. As noted, I have been engaged by the PAA Defendants as a rebuttal witness to the opinions stated by Lowry on behalf of the Commission. In carrying out this engagement, I have been asked to analyze the charges in this matter, to review the documentary and evidentiary record in this case and to provide an analysis, report and testimony, including on matters related to: (1) the offering of securities in this matter, and relevant laws, regulations, policies and practices related to the offering; (2) the offering documents utilized in this offering and the disclosures they provide, as well as their relationship to other documents related to the offerings; (3) the obligations of broker-dealers under the federal securities laws and self-regulatory organization rules related to offerings of securities and industry practices related thereto, particularly in undertaking a "reasonable investigation" with respect to disclosure in offering materials; (4) the actions of the PAA Defendants in discharging their regulatory obligations; (5) the responsibility of issuers in private placements to have audited financials; and (6) the obligations of the PAA Defendants with respect to information obtained before, during and after the issuance of the offering documents related to the issuance of audited financial statements.

My services are being billed to the PAA Defendants at a rate of $525 per hour.

V.      **Basis for Opinion**

My review, analysis and report are based on:  (1) extensive knowledge of the federal securities

laws, rules and regulations developed over a 40-year career, beginning with coursework at Harvard Law

School, through my experience as an attorney and manager at the Commission and two securities

exchanges, and continuing in my senior legal and compliance roles in the industry and in financial

services professional organizations; (2) my practical experience in analyzing and applying the federal

securities laws, and Commission and self-regulatory organization rules and regulations, obtained over the

decades while serving on the Commission staff, as a senior officer of two stock exchanges, and in senior

legal and compliance positions at a variety of broker-dealers, ranging from a "bulge bracket" firm to

small boutique firms; (3) review of the pleadings, deposition testimony and other documents relevant to

this matter, as set forth in Appendix B of this Report.

VI.     **Background**

**A. Public vs. Private Securities Offerings**

The Securities Act of 1933 and Commission rules adopted thereunder set forth a comprehensive

set of disclosure requirements for issuers that make *public* offerings of securities.  The issuer must file a

registration statement with the Commission, including a preliminary prospectus.  The matters that must be

covered in the registration statement and prospectus for a new issuer are set forth in Form S-1, and

instructions on the content are described in detail in Commission Regulation S-K.  The form and content

of financial statements included as part of the registration are set forth in another comprehensive

Commission rule, Regulation S-X.  Among other things, these rules require that financial statements be

audited and produced within prescribed time periods, and govern the qualification of accountants and

auditors acceptable to the Commission to prepare reports related to the financial statements.  As the

offerings at issue in this matter are not public offerings, none of this comprehensive regulatory scheme is

directly relevant here.

The Securities Act and Commission rules provide a number of exemptions from the requirement

that an offering of securities be registered.  Of particular relevance here is Section 4(2) of the Securities

Act, which provides an exemption from registration for private placements that do not involve a public offering of securities. The Commission has adopted various rules to provide guidance with respect to these exemptions, including Regulation D, which includes a "safe harbor" that provides assurance to an issuer that, if it complies with the terms of the safe harbor, its distribution will not be deemed to be a public offering subject to registration. The issuer in this matter, American Growth Funding II, LLC, offered securities in this matter in reliance on an exemption from registration and Regulation D, and this is not in dispute.

In contrast to the comprehensive disclosure requirements for registered offerings, private offerings are subject to few, if any, specific disclosure requirements. For example, under Rule 502(b) of Regulation D, if an private offering is made only to accredited investors, an issuer is not required to provide any prescribed written disclosures, including audited or even unaudited financial statements, to prospective investors. Despite the absence of mandated disclosures, most issuers that make private offerings of securities look to the Commission's requirements for registered offerings as a starting point. Regardless of how closely they follow the format or content, the disclosures that are made must be truthful. While exempt offerings are not subject to the stringent liability provisions of Section 11 and 12 of the Securities Act, they are subject to the anti-fraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**B.      Reasonable Investigation Obligations of Broker-Dealers**

Under the Exchange Act, a "broker" is defined as a person who is engaged in the business of effecting securities transactions for others. A "dealer" is defined as a person engaged in the business of effecting securities transactions for its own account. A firm that assists an issuer in a distribution of securities is generally acting in a broker-dealer capacity. Even if the offering is exempt from registration, a broker-dealer who facilitates the offering is subject to registration. In addition, the Commission has defined the term "underwriter" to broadly encompass both distributions in which the broker-dealer commits its own capital and those in which it acts as a placement agent.

There is a somewhat mistaken belief that the federal securities laws impose an obligation on a broker-dealer to conduct due diligence on an issuer in connection with a registered offering of securities. This is not the case. As the court noted in the landmark case, *In re Enron Corp. Securities Litigation,* (S.D. Tex. 2011), 761 F. Supp. 2d 504, 572: "There is no statutory requirement that an underwriter conduct a due diligence investigation into a proposed public or private offering. The term 'due diligence' does not occur in any federal securities statute." Instead, the courts have opined, in a private offering, a dealer's liability can only arise from Rule 10b-5, which requires a demonstration of fraudulent intent. See *BNP Paribas Mortgage Corp. v. Bank of America,* 866 F. Supp. 2d 257 (S.D.N.Y. 2012). The concept of "due diligence" has arisen merely as a defense by a broker-dealer acting as an underwriter that it did not act recklessly or with fraudulent intent.

Even though there is not a due diligence obligation *per se* imposed on underwriters of registered (public) securities offerings, there is a requirement in Section 11 of the Securities Act that they undertake a reasonable investigation and have reasonable grounds to believe the truthfulness of the disclosures in the registration statement. In 1982, the Commission adopted Rule 176 under the Securities Act, which identifies "relevant circumstances" for assessing whether a reasonable investigation or reasonable belief exists. Among the areas identified are: reasonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts; when the person is an underwriter, the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registrant; and whether, with respect to a fact or document incorporated by reference, the particular person had any responsibility for the fact or document at the time of the filing from which it is incorporated. The fact-intensive nature of the consideration of whether a "reasonable investigation or reasonable belief" exists is underscored by the fact that the items identified are not termed "criteria" or "factors." Rather, the Commission, somewhat awkwardly, describes them as "relevant circumstances." Notably, the Commission has resisted industry efforts to make Rule 176 a safe harbor, which could limit its flexibility in applying the circumstances identified in the rule in particular cases.

There is no counterpart to Section 11 imposing a reasonable investigation obligation on a broker-dealer serving as placement agent in a private placement of unregistered securities, and hence no counterpart to Rule 176 setting forth the factors or considerations that might bear on the reasonableness of the broker-dealer's investigation in that context.  FINRA, however, has provided "guidance" to member broker-dealers in April 2010 in Notice to Members 10-22, "Regulation D Offerings – Obligations of Broker-Dealers to Conduct Reasonable Investigation in Regulation D Offerings" ("FINRA Notice 10-22). The notice reminds broker-dealers that Regulation D private placements, while exempt from registration, are not exempt from the anti-fraud provisions of the federal securities laws, and that firms must satisfy their obligations under FINRA's suitability rule (Rule 2310) and advertising and supervisory rules of FINRA and the Commission in recommending securities offered under Regulation D.  The FINRA Notice states that "[c]ourts have found that the amount and nature of the investigation required depends, among other factors, upon the nature of the recommendation, the role of the broker in the transaction, its knowledge of and relationship with the issuer, and the size and stability of the issuer."  It also acknowledges that "there are no 'iron clad rules as to what a broker must do to meet his responsibility'." It notes, though, that broker-dealers should be alert for "red flags" in determining the scope and nature of their investigation.  FINRA cautions that the degree to which a broker-dealer may rely on information supplied by the issuer will depend on the facts and circumstances, and that it "may not rely blindly upon the issuer for information."   FINRA Notice 10-22 discusses certain factors that FINRA believes are relevant to a broker-dealer's investigation, including the relationship or affiliation between the broker-dealer and issuer, the broker-dealer's role in preparing the offering memorandum, the presence of red flags, reliance on counsel or other syndicate members, and the sophistication of the customers.  The notice closes by reporting on a survey conducted by FINRA staff of industry participants on practices they follow to discharge their reasonable investigation obligations.  The list provided corresponds to the general topics covered in due diligence checklists that I have seen over the years at many investment banks.

11

FINRA Notice 10-22 is not a formal FINRA rule, nor does it have any precedential effect. Also, while the FINRA notice contains a passing reference to the fact that broker-dealers are subject to the anti-fraud provisions of the federal securities laws in selling private placement securities, the subsequent guidance in the notice is largely focused on a broker-dealer's obligations under the FINRA suitability rule, not the anti-fraud provisions of the federal securities laws.[2]  While a broker-dealer that makes unsuitable recommendations may also violate the anti-fraud rules, it is by no means the case that every suitability violation under FINRA rules constitutes a violation of the anti-fraud rules under the federal securities laws, and it would be an error to conflate the two concepts.

## VII.   The Facts in the Record

## A.   The American Growth Funding II Private Placement Memorandum

American Growth Funding II issued a private placement memorandum on February 11, 2011 (the "2011 PPM").  The PPM related to the sale of up to $50,000,000 in units consisting of 12% preferred limited liability company interests in the company.  The PPM provided that the offering would cease on February 24, 2012, unless terminated earlier.  A second PPM for the sale of the units was issued on February 25, 2012, with a termination date on or before February 25, 2017 (the "2012 PPM").  A third PPM was subsequently issued on March 21, 2014, with the offering extended to a time not later than December 31, 2014 (the "2014 PPM").  The first two PPMs are the subjects of the Commission charges in this matter.  The two PPMs are substantially similar in content, although there are minor differences in

---

[2] FINRA Notice 10-22, while useful in setting forth FINRA's views regarding the measures that FINRA members should consider in meeting their suitability responsibilities under its rules, is of limited direct relevance in assessing the anti-fraud charges brought by the Commission in this case. While FINRA notes in the notice that a broker-dealer that fails to meet its duties of reasonable investigation may as a result violate these anti-fraud provisions, the decisions on which the guidance primarily relies are largely inapposite. It relies heavily on *Hanly v. SEC,* 41 F.2d 589, a 1969 case that involved affirmative misrepresentations in connection with secondary market sales of a publicly traded stock. The case cited by FINRA for the proposition that there is "no iron clad rule" on a broker-dealer's responsibilities, *University Hill Foundation vs. Goldman Sachs,* 422 F.Supp.879 (S.D.N.Y. 1976), involved the sale of commercial paper in the 1970 Penn Central debacle. The case was brought under Section 12(2) of the Securities Act, which, unlike Section 10(b) of the Exchange Act or 17(a) of the Securities Act, does not require scienter. The notice also makes several cites to *NASD v. Everest Securities,* 116 F.3d 1235 (8th Cir. 1997), an NASD disciplinary case that did in fact involve a private placement of securities. That case, however, did not involve allegations of fraud, or even suitability, but rather violations of the NASD's "just and equitable principles of trade" rule. In that matter, the SEC upheld, and the Court affirmed, NASD fines against three respondents totaling $15,000.

one part of the PPM that have received much attention in this case. The description of the PPM that follows applies primarily to the 2011 PPM, although it is generally applicable to the 2012 PPM as well, given the similarity in their content.

1.     **Preparation of the PPM**

The PPM states on the cover that it was "prepared solely by AGF II" for the use of prospective investors considering the purchase of the units being offered. Testimony from Ralph Johnson, the Chairman of AGF II, indicates that the first draft of the PPM was prepared in February 2010, almost a year before the PPM was issued. (Johnson Deposition TR at page 32ff). Johnson indicated that the initial draft was based on a template, and was put together by outside counsel. Johnson forwarded the draft to Allen. Johnson described the preparation of the PPM as a "collaborative" process between himself and Allen (John Deposition TR at page 46), with Allen insisting on language in certain areas (not identified). The record confirms that PAA and Allen used experienced outside securities counsel in reviewing the PPM (John Gilbert On-the-Record TR at pages 85ff, Russell deposition TR at page 22 ff), with some of the language suggestions that Allen made to Johnson on the PPM originating from counsel (email exchange between Allen and Johnson, December 10, 2010; Johnson Deposition TR at page 52-3.) Overall, the testimony of the parties makes clear that Johnson and AGF, not Allen or others at PAA, had primary responsibility for preparation of the PPM (John Gilbert On-the-Record TR at page 70, Allen On-the-Record TR at pages 42-44), with Johnson making the final determinations on its content (Johnson's December 10, 2010 email reply to Allen stated: "Suggested changes N – O – T – E – D. Many of them will make it in.").

With respect to the language in the PPM regarding audited financials, which as discussed below is a major focus of this case, the record is unclear. In the February 2010 initial "proof," this provision stated simply: "The Company's annual financial statements will be audited by the [sic] independent firm of certified public accountants." In the final version of the 2011 PPM, this sentence was altered to state: "*As has been policy in the past*, the Company's annual financial statements will *continue to* be audited by *an* independent firm of certified public accountants." (*emphasis supplied*). As the change purports to

13

describe a policy of the Company, which was controlled by Johnson, it is reasonable to presume that Johnson was responsible for it. Johnson, however, does not recall how or why this change was made. On its face, however, the change is illogical, as AGF II was a brand new entity without any operating history. It is plausible that this language was meant to reference a "policy" held by Johnson or adopted for other entities affiliated with AGF II. Neither PAA nor its counsel recalled any involvement with inclusion of this reference in the PPM. (Allen On-the-Record TR at page 58; John Gilbert On-the-Record TR at page 130; Russell Deposition TR at pages 56-57). Given that the responsibility for maintaining the books and records of the Company rest with the Company, and not the sales agent, it is not plausible that this language change was proposed by the PAA Defendants.

It is perfectly acceptable for a sales agent for a private placement program, such as PAA in the AGF II offering, to have a central role, peripheral involvement, or virtually no role, in the drafting of a PPM (other than with respect to the disclosures, if any, made about the sales agent and its role in the transaction). FINRA Notice 10-22 seems to suggest that a broker-dealer that has a significant role in preparing a private placement memorandum has increased due diligence obligations.[3] However, it is far from clear that FINRA would accept the converse, i.e., that a broker-dealer that does not draft a PPM has reduced due diligence obligations, or that its due diligence obligations are diminished with respect to elements of a PPM that it did not draft. It is fair to say, and consistent with decisional law, that the *manner* in which a broker-dealer undertakes its due diligence review will vary with the level of its direct involvement in the preparation of the PPM, or portions thereof. It is also fair to say, especially with regard to statements of future intent (as here, the commitment to provide audited financials in the future), that a broker-dealer participating as a sales agent is reasonably entitled to rely on the representations made

---

[3] FINRA Notice 10-22 at page 5. The notice states that, "A BD that prepares the private placement memorandum or other document has a duty to investigate securities offered under Regulation D and representations made by the issuer in the private placement memorandum or other document. In a recent enforcement action, FINRA found that a BD that prepared a private placement memorandum containing material misstatements and omissions about such matters as the amount and timing of distributions and the targeted return of principal to investors violated FINRA Rule 2010, which requires BDs to comply with just and equitable principles of trade."

by the issuer, unless there is a reason to believe those representations are not truthful. This specific issue is discussed in much greater detail in section VII.A.8. below.

**2.      The Business of AGF II**

The PPM states that AGF II was formed for the primary purpose of supporting the growth of small businesses by providing them with financing through the Company's suite of factoring and other loan products. (2011 PPM at page 3.) The PPM discloses that the Company and the Manager are newly formed entities (2011 PPM at page 27). In the Summary of the Offering, the Company discloses that it had no previous operating history: "The Company expects to commence business as soon as possible following the initial closing at which the Company approves the first subscription of units." (2011 PPM at page 19). The 2011 PPM states that the offering is being made for the purpose of capitalizing the Company with funds to make advances to small businesses and/or to purchase advances previously made by other lenders. (2011 PPM at page 5.) It goes on to describe a variety of advances under consideration (e.g., payroll advances, benefits advances, factored invoices, spot loans) (2011 PPM at page 37). Significantly, the PPM discloses in the risk and conflict of interest sections of the PPM that the Manager or its affiliates may provide financing (i.e., advances) to the same borrowers as AGF II or to competitors of such borrowers, and could do so without sharing such opportunities with AGF II. The PPM also discloses that the Manager might pursue "co-investment, joint venture or similar arrangements" between AGF II and such other entities, implicitly as a way of mitigating such risks and conflicts of interest. (2011 PPM at pages 29, 33-34). As it turned out, all or substantially all of the advances made by AGF II were made indirectly through the receipt of promissory notes to American Growth Funding, LLC, an affiliate of the Manager, which in turn extended advances to borrowers.

**3.      The Offered Securities**

The securities offered in the PPM were units consisting of 12% preferred limited liability company interests. The PPM states that the Company intended to make monthly distributions in an amount equivalent to 12% per annum (i.e., 1% per month). The PPM cautioned, though, that the Company's ability to make distributions was contingent on the results of the business and no rate of

return, or the return of principal, was guaranteed (2011 PPM at page 48). Investors could authorize the Manager to reinvest distributions into additional units rather than to receive a monthly payout of distributions (2011 PPM at page 49-50). Roughly comparable numbers of investors elected the immediate payout and reinvestment options.

The PPM stated that an investment in the units is intended to be a long-term investment. The units were subject to a two-year lock-up period, and could not be redeemed before the end of the lock-up. An investor seeking to redeem units was required to provide a redemption notice between 180 and 210 days before the end of the lock-up period. Units not redeemed were subject to a new two-year lock-up period. (2011 PPM at page 48, 50). The long-term and illiquid nature of the units is underscored in the PPM's discussion of risks, described in section VII.A.5. below. Units sold in the offering were issued in denominations of $100.00 per unit. A minimum purchase size of $50,000 was set forth in the PPM.[4] This minimum size provision is consistent with the determination to limit the offering solely to accredited investors, discussed immediately below.

4.    **Eligible Investors; Reliance Solely on the PPM for Investment Decisions**

The PPM states that the units were to be offered only to "accredited investors," as defined in Rule 501 of Regulation D. Accompanying the PPM was a "Confidential Suitability Questionnaire and Profile" that requested information regarding investor income and net worth, and required specific representations intended to assure that the prospective purchasers of the units were in fact accredited investors. There is nothing in the records I reviewed indicating that any of the AGF II investors were not accredited investors. Prospective investors were also required to make several additional representations in writing, including that: they have received, read and fully understand the PPM and are basing their decision to invest "solely on the information provided in this Memorandum"; they understand that an investment in the units involves substantial risks; they are committing to investments that are not readily marketable and

---

[4] Although the PPM does not provide for an explicit waiver of the minimum purchase amount, records from PAA indicate that more than a dozen of its clients invested less than the prescribed $50,000 minimum, generally in amounts ranging from $20,000 to $30,000.

are not disproportionate to their individual net worth; and they are willing to accept the risk of losing their entire investment in the units. The caution to investors to rely solely on the PPM is emphasized elsewhere in the PPM: "No person is authorized to give any information or make any representation not contained in this Memorandum and any information or representation not contained herein must not be relied on." (2011 PPM at page 7, in BOLD); "The Offering is made only by means of this Memorandum. Except as described herein, neither the Company nor the Manager has authorized the use of other sales materials in connection with the Offering. No dealer, salesman or other person has been authorized to give any information or to make any representations other than those contained in this Memorandum, and, if given or made, such information or representations must not be relied on." (2011 PPM at pages 45-46).

5.    **Disclosures of Risks and Conflicts of Interest**

The PPM is replete with disclosures warning investors of the risks involved in investment in the units. It states, among other things: "Investment in the units offered hereby involves a high degree of risk and immediate substantial dilution." (2011 PPM at page 4, in BOLD); "An investment in the Units is speculative and involves a high degree of risk . . . . You should not invest in the Units unless you are in a position to lose your entire investment." (2011 PPM at page 6); "The securities described herein are speculative and involve a high degree of risk. There is no public market for such units. Each investor will therefore be required to hold the units for an indefinite period of time and continue to bear the economic risk of a total loss of such investment." (2011 PPM at page 9, in BOLD).

A separate, seven page section of the PPM is devoted to a discussion of "Risk Factors" related to investment in the units (2011 PPM at pages 26-32). Among other things, this section provides disclosures on the following matters: the manager has not identified any advances to be funded by the Company; many obligors will be small businesses with limited resources, and there may be a risk of non-collection of advances made to them; the Company and Manager have no operating histories; regulations, including usury laws, may impose various requirements, interest ceilings or penalties; advances may be secured or unsecured, and even where advances are secured, pledged collateral may be insufficient in the event of a default, or collection could be delayed or impaired.

The Risk Factors section contains an extensive discussion of conflicts of interest related to the offering. It notes that the Company is solely dependent on the Manager for its success. It further discloses that Ralph Johnson, Chairman of the Company and a principal of the Manager, is also a principal and Board of Managers member of other American Growth Fund investment pools and entities with similar investment philosophies. It discloses that affiliates of the Manager may provide investment banking, brokerage, financial, investment, management or other services to the Company and/or borrowers from the Company or competitors of borrowers. In this connection, the PPM discloses that the Manager or its affiliates may enter into co-investment, joint venture or similar arrangements with AGF II. It adds that, if they do so, those arrangements will be as near as possible on an arms' length basis.

This section also discloses that the Manager and entities controlling or controlled by the Manager have relationships with control persons selling the units. While the PPM states that the Manager may select more than one selling agent, it discloses that the Manager has selected PAA to act as the (sole) selling agent. (This is disclosed on pages 5-6 of the 2011 PPM and elsewhere.) The Risk Factors section discloses various connections between AGF II and the Manager with PAA, including the fact that a control person of PAA is the owner of an entity that owns 49% of the Manager. In addition, it notes that the same control person owns an affiliate that is a branch office of PAA and may also provide financial and strategic advisory services for the Company now or in the future for which it could be compensated.

Information regarding the conflicts of interest involving the Manager and its affiliates, and PAA and its control person and affiliates, is further provided in a separate two-page section (2011 PPM at pages 33-34), and these various conflicts of interest referenced in other parts of the PPM as well (see, e.g., 2011 PPM at pages 6, 21, and 45).

## 6.   Forward-Looking Statements

The PPM states that all matters it discusses "which constitute forward-looking information (generally indicated by words such as 'believes', 'anticipates', 'expects', 'intends', and words of similar import) involve risks and uncertainties, including but not limited to economic, competitive, governmental and technological factors affecting the Company's operations, markets, products, services and other

factors discussed herein by the Company" (page 11). It goes on to state that "there can be no assurance that the forward looking information contained in this Memorandum will in fact transpire or prove to be accurate" (page 12).

Notably, as a newly formed entity, AGF II did not have financial statements prior to the 2011 PPM. Thus, the statements regarding accounting methods and audited financials in the 2011 PPM can only reasonably be viewed as forward-looking statements of intent, notwithstanding the statement that the financials "will continue to be audited." In other words, it is unreasonable to interpret that statement to mean that prior audited statements exist, when it is undisputed that AGF II was a newly formed entity with no prior operating history.

By the time the 2012 PPM was issued on February 25, 2012, the Company had a year of operating experience under its belt. As a consequence, some of the representations in the "Method of Accounting" section of the PPM, those regarding maintenance of books and records and accounting approach, were no longer forward looking. By contrast, having just completed its first year of operation, AGF II's annual financial statements had not yet been completed, so the statement that the financials "will continue to be audited" remained a forward-looking statement of intent.

7.     **The Operating Agreement and Other Investor Materials**

In several places the PPM makes it clear that investors seeking to purchase the units should rely solely on the information contained in the PPM itself (see citations in Section V.A.4. above). Other materials, however, were provided to prospective investors along with the PPM, including a copy of the Operating Agreement, a Confidential Suitability Questionnaire and Profile, and a Subscription Agreement. There are some references to these materials in the PPM. The PPM makes reference to the Subscription Agreement in describing the procedures for prospective investors to subscribe to the offering (See 2011 PPM at page 46). The PPM also provides a brief summary of the Operating Agreement, and urges prospective investors to review the entire Operating Agreement before subscribing (See 2011 PPM at page 49). However, the PPM does not, explicitly or implicitly, incorporate by reference any of these other materials, including the Operating Agreement, into the PPM. Other than the section summarizing

the Operating Agreement, the only other references in the PPM to the Operating Agreement are to

sections that could serve to limit the rights and recourse of investors in the units. The PPM discloses that

the Operating Agreement limits the liability of the Manager to the Company and to investors and provides

indemnities to the Manager (see 2011 PPM at pages 30, 47 and 51). Significantly, the 2011 and 2012

PPMs make no references to the Operating Agreement provisions regarding the production of unaudited

quarterly or audited annual financial statements, discussed in further detail below.

**8.      Disclosures Regarding Audited Financial Statements**

      Much of the Commission's case against the PAA Defendants in this matter turns on a single

sentence on the last page of the 53-page PPM. Under a section entitled "Method of Accounting," the

2011 PPM first states: The Company will maintain its books and records and report its income tax results

according to the cash method of accounting." Thereafter follows the critical sentence: "As has been

policy in the past, the Company's annual financial statements will continue to be audited by an

independent firm of certified public accountants."

      In the 2012 PPM, the second sentence is revised to read as follows: "As has been policy in the

past, the Company's annual financial statements will continue to be audited by an independent firm of

outside accountants." A third sentence is also added: "In the past, the company has used G. Carapella &

Associates, conducting business in New York for over 30 years, and will likely continue to do so."

      Neither PPM's disclosure provides any information on the timing of the audits or their delivery to

investors, nor makes any references to the Operating Agreement, which contains a far more detailed

covenant regarding preparation and furnishing of audited financial reports.[5]

---

[5] Section 11 of the Operating Agreement provides a far more detailed description of AGF II's "Accounting, Books and Records, Reporting Obligations." Section 11.2 states that the Company shall keep "full, complete and accurate books of account and other records" that "shall be kept in accordance with generally accepted accounting principles ("GAAP") and procedures consistently applied." Section 11.5 goes on to add, "The Company shall furnish the following financial statements and reports to the Members [unit investors]: (i) within ninety (90) days after the end of each Fiscal Year, annual audited financial statements of the Company; (ii) with ten (10) days after the end of each calendar quarter, an unaudited quarterly statement of operations with respect to such quarter (iii) such other operating reports as shall be reasonably requested by any Limited Member."

If AGF II had wished to incorporate the Operating Agreement by reference into the 2011 and 2012 PPMs, it surely knew how to do so. Those two PPMs were followed by a third PPM in 2014. The 2014 PPM is not the subject of the Commission Enforcement action. In sharp contrast to the 2011 and 2012 PPMs, which mentioned nothing about the accounting provisions in the Operating Agreement, the 2014 PPM's accounting disclosures are drawn almost entirely from the Operating Agreement, which is referenced explicitly. It contained the following disclosure: "[T]he Operating Agreement provides that the Company will prepare annual financial statements, which will be audited by an outside firm of independent certified public accountants, and financial statements for quarterly periods that do not end with the Company's fiscal year, which will not be audited or reviewed. The Operating Agreement provides that the Company shall prepare: (i) within ninety (90) days after the end of each Fiscal Year, annual audited financial statements of the Company with respect to such year, (ii) within thirty (30) days after the end of each calendar quarter, an unaudited quarterly statement of operations with respect to such quarter and (iii) such other operating reports as shall be reasonably requested by any Limited Member; provided that such reports only require information available to the Manager without unreasonable expense. The Operating Agreement also provides that the Manager shall provide to each Limited Member such audited annual financial statements promptly after they become available, and such unaudited quarterly statements of operations within 30 days following a written request from the Limited Member." There are no separate disclosures regarding the Company's financial statements in the 2014 PPM other than the references taken from the Operating Agreement.

**B.     Reasonable Investigation Performed by the PAA Defendants**

**1.     General Discussion of Considerations in PAA Due Diligence on AGF II**

As discussed in Section IV.B. above, assessment of the reasonableness of a broker-dealer's investigation efforts in acting as a placement agent in a private offering is highly dependent on the facts and circumstances of the transaction. Relevant factors in that assessment include the nature of the broker-dealer, the nature of the issuer and the nature of the transaction.

The manner in which the investigation process is undertaken varies substantially depending on the size and structure of the firm.  Larger broker-dealers generally have separate departments or divisions devoted solely to investment banking activities, often with specialized groups within Investment Banking devoted to private placements, occasionally with further specialization focused on venture capital or other unregistered entities.  These firms will typically have detailed policies and procedures for the conduct, documentation and oversight of due diligence.  Before proceeding with an underwriting, transactions will generally undergo supervisory review within Investment Banking, often followed by review by a commitment committee consisting of senior banking, capital markets, syndicate and other personnel.  At large firms, separate commitment committees may be formed for different types of securities, and depending on the transaction, their review may be supplemented by reviews by sales, new product, new business, risk or other committees.  At such firms, Compliance rarely has a role in the due diligence process for individual transactions, and may only engage in very limited, if any, general oversight of the due diligence process.  Senior management of the broker-dealer may also have little, if any, involvement in any but the largest transactions.

As firms shrink in size, or their investment banking activities become more limited, elements of the specialized committee structure start to melt away.  As a corollary, the involvement of general control elements such as Legal, Compliance and firm management increases.  At the smallest firms, there may be few, or no, specialized structures, and oversight of due diligence procedures may be largely integrated into the overall management and supervision of the firm.  Such integrated structures are by no means unusual; FINRA has estimated that literally hundreds of broker-dealers, approaching 20% of all its member firms, limit their activities primarily to private placements of unregistered securities.[6]  Many of these firms are the size of PAA, or even smaller.  Their size does not permit the layering of

---

[6] See Davis Polk, "FINRA Establishes New Limited Registration Regime for 'Capital Acquisition Brokers,' Including Private Fund Placement Agents," September 13, 2016.  FINRA has proposed, and the Commission has recently approved, a new limited category of registration for broker-dealers that limit their activities to private placements of unregistered securities, M&A advisory services to privately held companies, and similar activities.  In proposing the rule, FINRA estimated that between 650 and 750 broker-dealers, between 16% and 19% of all of its member firms, could qualify for the new limited category.

responsibilities, and systems of checks and balances, of larger firms, but does permit direct involvement by senior management of the firm in a manner not possible at larger firms. The size and business of the firm is among the relevant circumstances bearing on what constitutes reasonable investigation by the firm in acting as a placement agent in a private placement.

Not surprisingly, given its small size, PAA has a tightly integrated structure and lacked specialization. Based on Wasserman's deposition testimony, due diligence activities are carried on by salespersons or managers who also function as investment bankers, with Wasserman, in her role as Chief Compliance Officer, serving as the "Designated Principal" responsible for general supervision of the Firm's private placement activities. (Wasserman Deposition TR, at page 44-50). Under this structure, the investment bankers are responsible for conducting the direct due diligence investigation, and Wasserman, as the designated principle, is responsible for overseeing the process to assure that it is carried out. The Firm's written supervisory procedures provide that Wasserman, as designated principle, "will make every effort to ensure that the offering memorandum used in its offerings do not contain materially misleading disclosures." This does not mean, however, that she is obligated to directly verify such disclosures herself, any more than a CEO's certification under FINRA Rule 3130 that his or her Firm has processes to establish, maintain, review and test the effectiveness of compliance policies and procedures to comply with FINRA rules and the federal securities laws requires that the CEO personally carry out those processes. Through observation of and discussions with the sales personnel/managers who are conducting due diligence, coupled with her own review of the private placement memorandum, she is capable of discharging the obligation set forth in PAA's written supervisory procedures. The initialing of the private placement memorandum by the investment banker on the private placement memorandum and by Wasserman (Wasserman Deposition TR at page 57ff) is intended to signify that they have discharged their respective responsibilities.

The amount and type of due diligence that will constitute reasonable investigation will also vary depending on the type of issuer and the type of offering. FINRA Notice 10-22 asserts that a more

thorough review is required for securities issued by smaller companies of more recent origin.[7]  While this may seem intuitive, in many cases it is aspirational at best and often is unrealistic, especially for a newly formed entity, such as AGF II.  An examination of the items identified in the survey reported at the end of the notice demonstrates the challenges of conducting a "more thorough review" of a newly formed entity. Among the items included on the list of items suggested for review are:  historical financial statements; trends indicated by the financials; internal audit controls; contacts of customers and suppliers; contracts, leases, mortgages and other contracts; past securities offerings; pending litigation; previous regulatory or disciplinary problems of the issuer; patents and other intellectual property rights; issuer's assets and facilities; and engineering, geological and similar reports.  Few if any of these items are likely to exist with respect to a newly formed entity that has not previously been in business.  None existed at AGF II prior to the 2011 PPM.  Other items on the FINRA survey checklist can and should be examined—e.g., the business of affiliates, the issuer's management and its expertise and regulatory history, management compensation, and business plans and business models.  Nevertheless, even some of these items will not be amenable to the detailed, tangible examination possible of the ongoing business activities of an established issuer.  Faced with this reality, a broker-dealer conducting a "reasonable investigation" of a newly formed entity should try to conduct a reasonable investigation of what little tangible information may be available, but otherwise will address this challenge by assuring that there is clear and forthright disclosure in offering documents of the risks posed in investing in the securities of the new enterprise.

2.      **The AGF II 2011 Offering**

        Based on a review of the record, it appears that PAA and its staff performed a reasonable investigation of AGF II in preparing for the offering and in reviewing and providing input into the offering document.  The 2011 PPM was not hastily prepared.  The initial draft of the PPM was prepared at least a year before the offering was launched, and went through multiple drafts.  (Johnson Deposition

---

[7] See FINRA Notice 10-22 at page 3.  To support this proposition, the FINRA notice cites *Hanly v. SEC,* 415 F.2d 589, 597 (2d Cir. 1969).  That case involved secondary market trades in a publicly traded stock.  Hence, it did not involve private placements of unregistered securities, and was unrelated to underwriter "reasonable investigation" or due diligence obligations.

TR at page 32ff). The record indicates that PAA personnel, particularly Allen, were actively involved in discussions with AGF II management regarding the fund and its upcoming offering. (John Gilbert On-the-Record at pages 104-108; Allen On-the-Record TR at pages 41-44). The original template for the PPM was provided by outside securities counsel to Johnson, who has stated that he then sent it to Allen for review by PAA. Thereafter, John Gilbert had primary responsibility at PAA for review of the PPM, and he has testified, and the record shows, that he had multiple conversations with outside counsel regarding the PPM (John Gilbert On-the-Record at 85-86, 103, 122; Russell Deposition TR at pages 106-122, and Exhibits PAA 20-PAA 30 thereto). Counsel for PAA prepared written comments on the PPM which Allen relayed to Johnson (Johnson deposition TR at page 46, 52-54). Wasserman confirmed that counsel for PAA reviewed the PPM, as did John Gilbert, and she states that she oversaw that process, reviewing Gilbert's due diligence folders, and herself reviewed the PPM for compliance-related matters, such as risk disclosures. (Wasserman Deposition TR at pages 69, 76). The final PPM was reviewed and signed off on by both Gilbert and Wasserman (Wasserman Deposition TR at pages 57ff).

The section of the PPM related to accounting treatment, including the disclosures related to audited financials, fall into the category of matters for which a due diligence investigation is difficult. As a newly formed entity without any operating history, AGF II had no prior books and records to review, and audit of its annual financial statements could not be undertaken until it had been in operation for a year and closed its books. The reference in the disclosure to the Company's "policy in the past" of having its financials audited is admittedly confusing. If Johnson intended to convey that it had been his policy, as Chairman of AGF II and a principal of its Manager, to audit AGF-related entities, the statement is imprecise, as it should have referenced the policy of the Company's management and affiliates, not the Company itself. If it was in fact intended to reference AGF II itself, as it is literally written, it is clearly incorrect, as the Company had no past. But I am unable to conclude that this representation is materially misleading. In reading the PPM as a whole, that statement could only lead to the conclusion that the Company intended to have its financials audited in the future. As a result, a reasonable investor could not have been misled by this statement, and the failure by PAA and its personnel to catch this logical slip was

clearly not intentional, nor does it reflect a material failure in PAA's due diligence on the 2011 AGF II offering.

## 3.     The 2012 AGF II Offering

Even though the 2012 PPM in essence was simply a continuation of an ongoing offering that commenced with the 2011 PPM, it constitutes a separate private placement, and PAA, as placement agent, had an obligation to make a separate reasonable investigation with respect to the 2012 offering. Following John Gilbert's departure from the firm in October 2011, Allen now assumed direct responsibility for conducting due diligence on the 2012 PPM. Unlike the circumstances of the 2011 PPM, by the time the 2012 PPM was issued AGF II did in fact have an operating history, albeit a limited one. As part of the due diligence process for the 2012 PPM, Allen testified that he looked at client schedules and loan schedules, including loan payments made and scheduled. (Howard On-the-Record TR at page 234). From that, he made an assessment of the apparent default rate, which he felt to be reasonably low. At the time, he recalls only one loan customer of AGF II that appeared to be a non-payment risk (Howard On-the-Record TR at page 231). Allen and Wasserman both reviewed the 2012 PPM and indicated by initialing it that they had signed off on its use. (Wasserman Deposition TR at page 97, 106; Allen On-the-Record TR at pages 71-72; Allen Deposition TR at page 117).

Given AGF II's limited operating history, the description of the risks of investing in AGF II remain largely unchanged from the disclosures provided in the 2011 PPM. While the 2011 PPM disclosed that the Manager of AGF II had no operating history, the 2012 PPM conceded, after one year of operation, that the Manager had only "limited" operating experience and the Company had only a "limited" performance history. (2012 PPM at page 27). While the 2011 PPM disclosed that the Company had not identified any advances (loans) for the Company to make, the 2012 PPM disclosed that it had not identified any "new" advances to be funded by the Company at the time of the offering (2012 PPM at page 26).

With respect to the section of the PPM discussing "Method of Accounting," the language of the 2012 PPM was changed slightly from the previous version. The PPMs provided an identical disclosure

regarding accounting methodology; i.e., that the Company "will maintain its books and report its income

tax results according to the cash method of accounting." The next sentence, relating to auditing of

financial statements, was changed slightly. The 2011 PPM stated, "As has been policy in the past, the

Company's annual financial statements will continue to be audited by an independent firm of *certified*

public accountants." In the 2012 PPM, this statement was revised to state: "As has been the policy in the

past, the Company's annual financial statements will continue to be audited by an independent firm of

*outside* accountants."(emphasis added).

A new sentence was added in the 2012 PPM to the end of the "Method of Accounting" section:

"In the past, the company has used G. Carapella & Associates ("Carapella"), conducting business in New

York for over 30 years, and will likely continue to do so." The PPM does not indicate whether the

statement about Carapella related to the maintenance of the Company's books and records and reporting

of income tax results, to the auditing of its annual financial statements, or both. In his deposition,

Johnson noted that the K-1 (tax reporting forms) had or were about to go out to investors, and Allen had

mentioned to him that it might be a good idea to provide the name of the accountant doing the K-1s; thus,

the sentence mentioning Carapella was intended to identify for investors the firm preparing the firm's tax

statements and tax reporting forms. (Johnson Deposition TR at pages 72-73). In Allen's 2014 on-the-

record testimony, he recalled, like Johnson, that the reference to Carapella was added to the 2012 PPM

because he was handling the investor tax forms. (Allen On-the-Record TR at page 72). In their late 2016

and early 2017 depositions, neither Wasserman nor Allen had a recollection of the circumstances

surrounding the addition of this sentence to the "Method of Accounting" section. (See Wasserman

Deposition TR at pages 102-103; Allen Deposition TR at pages 111-112).

The Commission's complaint and Lowry's opinion focus a great deal of attention on the

reference to Carapella in the 2012 PPM, as well as an allegedly forged letter that was ostensibly from

Carapella that referenced a purported audit of AGF II's 2011 annual financial statements. (See

Commission Complaint, paragraphs 42.-45). Johnson, for his part, states that this letter, despite its use of

the term "audit," was never intended to convey that Carapella, who is not a CPA, had performed a formal

audit. Rather, because Allen was entitled to a back-end participation (in the profits of the Company), Johnson indicated that Allen wanted assurance that Carapella had reviewed the financials of both AGF II and its management company. (Johnson Deposition TR at pages 86-91).

The Commission's allegations, if established, are clearly relevant to the Commission's fraud charges against Johnson. The relevance of the Carapella sentence in the 2012 PPM and the Carapella "audit" letter to the charges against the PAA Defendants, however, is much less clear. It is not likely that the Carapella sentence in the 2012 PPM would be material to prospective investors, whether it related back to the sentence about books and records or to the sentence about auditing of the firm's books and records. If anything, if a prospective investor was familiar with Carapella, knew that he wasn't a CPA, and read the section as stating that Carapella would be auditing the Company's annual financial statements, that would be a matter of concern, not of reassurance, in considering an investment in AGF II. At most, it could be regarded as providing assurance to investors that an accounting firm had been lined up to perform an audit of the firm's annual financial statements. Being the 2012 PPM doesn't provide any information on the timing of the audit, it is questionable whether this would be a material addition to the PPM. In any event, nothing in the record indicates that any investor either expressed concern about audit of the financial statements during the course of 2011 fundraising activities, or that any investor ever asked about Carapella sentence in the 2012 PPM.

The Carapella "audit" letter has no import in terms of the fraud charges against the PAA Defendants. The testimony is clear that the "audit" letter was never sent to, or seen by, anyone other than PAA. Regardless of whether or not Johnson intended it to serve as an audit opinion, Allen did not regard it as such, as evidenced by his subsequent efforts to prod Johnson to have AGF II's annual financial statements audited (see bullets on pages 30-31 below).

The Carapella "audit" letter arguably has relevance to the PAA Defendants in one other respect. It could serve as a "red flag" regarding the veracity of the management of AGF II. If Johnson's version of events is accurate, the letter was completely benign, supplied by Johnson in response to a request from Allen, in his capacity of a part-owner of AGF II's management company, to have the books of AGF II

28

and the management company reviewed as part of a year-end accounting of profits. On the other hand, if the Commission's version is accepted, the letter was a relatively amateurish attempt by Johnson to avoid the costs of a formal audit of AGF II. Even if Allen saw through that attempt, the episode would have put Allen and PAA on notice regarding Johnson's veracity. Even accepting that version, the import of this red flag is unclear. The episode occurred after the issuance both the 2011 PPM and 2012 PPM, so it would have been unrelated to the reasonable investigation PAA would have done on either document. It would be relevant to their subsequent sales efforts, and should have spurred them to make sure that a certified public accountant was identified to audit the Company's annual financial statements. As discussed below, that is precisely what did happen.

4.    **Ongoing Due Diligence With Respect to Audit of Financial Statements**

Neither the Commission Rule 176, which addresses the "reasonable investigation" issue for registered offerings, nor FINRA Notice 10-22, which proffers guidance to FINRA member firms on the reasonable investigation issue for Regulation D private placements, addresses the circumstances of a broker-dealer's "reasonable investigation" obligations to assure the continuing accuracy or truthfulness of disclosures contained in an offering document that is to be used on an ongoing basis. This obligation to review the disclosures on an ongoing basis, and if warranted, to update them is at the crux of the Commission's case against the PAA Defendants.

Clearly, not every event that alters the disclosures made in a PPM warrants amendment of the PPM, with the attendant drafting, attorney review, printing and other costs that would entail. For example, the 2011 PPM notes as a risk that no borrowers had been identified for advances (loans) from the Company, and that the Manager had no operating experience. Once the offering was launched, and subscriptions were received, the Company began making advances, and the Manager began to gain experience. That would all be expected, and absent some material adverse experiences with that process, it would not be reasonable to require subsequent amendments of the 2011 PPM to provide investors a "blow-by-blow" update on the Company's fundraising and lending experience. It would not be reasonable to expect that, when the 2011 PPM offering term had expired and a new PPM was issued, that

29

this disclosure would be updated to reflect that AGF II's operating experience.  This is just what was done in risk disclosure section of the 2012 PPM.

In connection with the representation that the Company would have annual audited financial statements, the PPM did not contain any time frame within which the audit would be conducted. However, the Operating Agreement, which PAA had reviewed, explicitly contemplated that audits would be done within 90 days of the end of the fiscal year.  So that should have triggered an inquiry by PAA regarding the preparation of audited financials by the second quarter of 2012.

The record indicates that this is exactly what occurred.  In early May 2012, Allen sent an email asking Johnson to send PAA a copy of AGF II's 2011 annual audited financial statements.  (Allen Deposition TR at page 128).  Subsequently, on May 21, 2012, Johnson emailed Allen year-end financial statements, but they were not audited.  (Email exchange between Johnson and Allen dated May 21, 2012). From that point, the record demonstrates that Allen prodded Johnson on numerous occasions, and Johnson made several attempts, to retain the services of various accounting firms to conduct audits of AGF II's year-end financial statements.  In a couple of instances, Allen himself identified potential candidates to complete the audits and directed them to Johnson.  The record shows:

- In early May 2012, Allen had discussions with Victoria Pellegrino of Raich Ende & Malter about auditing AGF II's financials.  (Allen Deposition TR at page 133).  This was a follow-on to a conversation they had on the topic of auditing AGF II held in December 2011, before AGF II's 2011 fiscal year had ended.  (Allen Deposition TR at page 132).

- In March 2013, Allen had discussions with Howard Hoff, from the accounting firm of Marks, Paneth, Shron, about auditing the financials, and put Hoff in touch with Johnson.  In late March, Hoff indicated to Allen that Johnson had decided to work with another accounting firm, Citrin Cooperman.  (Allen Deposition TR at page 162).

- In May 2013, a series of email communications were made from Allen to Johnson seeking to confirm that Citrin Cooperman had in fact been engaged to audit the financial statements.  (Allen Deposition TR at pages 162, 166-169; Johnson Deposition TR at page 125).  In fact, Citrin

Cooperman completed a "compilation" of the financials of AGF II, but not an audit of its financial statements. (Johnson Deposition TR at page 126).

- In October 2013, Johnson had a tentative agreement to retain Frazier Evangelista to audit the financials of AGF II. (Allen Deposition TR at pages 178-179). After receiving a subpoena from the Commission in connection with its investigation of this matter, Frazier Evangelista determined not to proceed with the audits. (Johnson Deposition TR at pages 109-110).

- Later in October 2013, Johnson retained Seymour Weinberg to complete the AGF II financial audits. (Johnson Deposition TR at page 151). Weinberg produced independent auditor reports for AGF II for FY2011 on January 15, 2014; for FY2012 on February 5, 2014; and for FY2013 on April 14, 2014.

The 2012 PPM contained a forward-looking statement that AGF II would have its annual financial statements audited, without setting forth a timetable for the completion of the audits. Audits were in fact completed, albeit after a delay of almost 18 months after PAA started pressing Johnson to have that done. Based on the ongoing series of communications during that period between Allen, Johnson and various independent accountants, it appears that the PAA Defendants maintained a good faith belief, ultimately borne out, that AGF II's annual financial statements would in fact be audited, consistent with the representation in the PPM (Wasserman On-the-Record TR at page 76; Allen On-the-Record at page 185).

It is reasonable to ask, as the Commission has done in its investigation into this matter, whether the PPM was required to be amended at any point during this time period to reflect the fact that the completion of audited financial statements was delayed. PAA retained outside counsel to advise them on just such an assessment. (Allen Deposition TR at pages 172-174). A number of factors support the determination of PAA not to require an amendment of the 2012 PPM:

- The PPM did not commit AGF II to completion of an audit of year-end financial statements within any prescribed period of time.

31

- The PAA Defendants maintained a good faith belief that the annual financial statements of AGF II would in fact be audited.

- The units in AGF II held by the Limited Members were non-transferable interests, subject to a two-year lock-up.  Hence, the importance of receiving audited financials within a prescribed period was much less significant than for freely tradeable stocks or bonds.  In this regard, for any investor who purchased units of AGF II any time after late summer 2012, the audits of the 2011 and 2012 fiscal years that were performed by Seymour Weinberg would have been timely.  An investor buying units on September 1, 2012, for example, would only have been able to redeem their units on September 1, 2014, and would have had to provide notice of their intent to redeem in the 30 day period beginning on or around February 1, 2014.  The audits for 2011 and 2012 were issued on January 15 and February 4, 2014, respectively.

- Throughout this period of time, investors continued to receive monthly statements covering their unit investments; investors who did not elect to re-invest their distributions received a payout of their distributions on a monthly basis.  Investors who redeemed their units after two years were re-paid their principal.

- Even though they did not constitute formal audits, PAA did receive quarterly financial reports from Johnson, unaudited financial statements from AGF II in 2012 (from Carapella) and a compilation of financial results in mid-2013 (from Citrin Cooperman).

When counsel was retained in mid-2013 to assess possible courses of action due to the delay in the preparation of audited financials, one course of action that was considered was to amend the operating agreement to dispense with the preparation of audited financials. (Wasserman Deposition TR at page 116-119; Allen Deposition TR at pages 172-174).  An amendment was drafted by counsel on behalf of PAA, (Wasserman On-the-Record TR at page 48; Kahler Deposition TR at page 62), and circulated to several investors holding the AGF II units.  Negative feedback was received from two of the larger

investors, one of whom expressed concerns about remaining invested unless an audit was completed. (Email from Lawrence Sucharow to Allen dated September 25, 2013; see also email from Alan Field to Jennie Pell dated September 25, 2013). Based on this feedback, this alternative was abandoned. In my opinion, exploration of this alternative approach, and circulation of this proposed amendment prepared by and with the guidance of outside counsel, in no way required that the PPM be amended or the offering suspended unless it was amended. Quite the contrary. Should the amendment to the Operating Agreement have been approved by the Limited Members of the Company in accordance with the terms of the Operating Agreement, it would have permitted the Company to dispense with audited financials. That would have required amendment of the PPM. When the determination was made to abandon the amendment and proceed with identifying an auditor, it was unnecessary to amend the PPM.

## VI.     Rebuttal of Lowry Opinion

### A.     Duty to Investigate

Lowry opines that PAA and Allen failed reasonably to investigate red flags concerning the AGF II offering. He asserts that their obligation to do so was heightened by the absence of audited financials and the presence of conflicts of interest. He identifies three red flags that he regarded as heightening Defendants' due diligence obligations: (1) the 2012 PPM misstated that the financials had previously been audited; (2) the high interest rates on the unit interests; and (3) the dependency on a single entity for cash flow. He also states that the PAA Defendants failed to meet their obligations under FINRA rules to use "reasonable diligence" to determine that their recommendations were suitable for at least some investors. He asserts that, since the sales personnel did not review audited information before recommending AGF II units to their customers, their resultant lack of understanding about the risks of the AGF II fund would violate the suitability rule.

There is simply no foundation in the record for Lowry's assertion that Allen failed to investigate conflicts of interest, how the money raised would be used to make loans, or to whom AGF II would lend money. The evidence indicates that the initial due diligence process lasted at least a year before the initial 2011 PPM was issued. Allen was clearly aware of the conflicts of interest between the the AGF II fund and

other AGF affiliates, as well as the potential conflicts arising from his partial ownership of the AGF

management company and PAA's relationship to AGF II.  Allen engaged in extended conversations with

Johnson about the fund, the units being offered, the kinds of borrowers that would be targeted and the

economics of the business.  More importantly, information about the potential conflicts of interest were

extensively and prominently disclosed in the PPM, as was information about the prospective business of

AGF II and the risks of investment in the unit interests.

Once the business was up and running, Allen stayed abreast of its development.  As PAA was the

sole sales agent, Allen was aware of the amount of funds the business was obtaining.  He has testified that

he spoke with Johnson at least weekly, and at times almost daily, about AGF II's business operations, and

they met in person to go over the financials quarterly.  As Lowry notes, sales of AGF II were responsible

for a meaningful percentage of PAA's revenues.  It defies common sense that Allen would not stay

abreast of its development, if only to be more effective in selling the unit interests.  Moreover, one of the

conflicts cited by Lowry—Allen's ownership stake in the AGF II management company—gave Allen a

direct personal economic incentive to remain informed about the business and its progress as it grew.

There is certainly nothing in the record to suggest that PAA customers were ever misled about the nature

of AGF II's business or the risks involved in investing in the units.

Lowry opines that three red flags heightened PAA's due diligence obligations.  First, he states

that the 2012 PPM misstated that the AGF II financials were previously audited.  This contention is a red

herring.  He relies entirely on the presence in the PPM of the erroneous language that, "as has been policy

in the past," the financials will "continue" to be audited to support the assertion that the Company has in

fact had audit reports produced in the past.  The first time this language appeared, in the **2011 PPM**, audit

reports could not have been produced, nor could a reasonable investor have believed that they could be.

The Company was newly formed and had not previously been in business.  Those facts were clearly

disclosed.  Moreover, regardless of the Company's policy, audit reports would not, in the normal course,

have been produced at the time the **2012 PPM** was issued, either, because the Company would have only

been in business for a year, and the PPM was issued less than two months after the end of the Company's

first fiscal year.  No audits were due at the time the 2012 PPM was issued, and a reasonable investor could not construe it otherwise.  At most, the language Lowry relies on expresses a commitment to have the Company's financials audited, without committing to a specific time frame to do so, and this commitment was in fact fulfilled when the audits were produced.

The PAA Defendants openly acknowledged that they did not focus on the seven-word phrase on which Lowry has pinned much of his opinion, either in their review of the 2011 PPM or the 2012 PPM. If they had noticed the obviously erroneous reference to "the past" of this indisputably newly formed Company that had no past, there is no reason to believe that they would have requested Johnson to correct it.  Even if the obvious error is regarded as a red flag, to fail to notice a red flag is not the same as ignoring it.  Based on Allen's discussions with Johnson, Allen and PAA believed that AGF II had committed to producing audited financials, and it did so.

The remaining "red flags" cited by Lowry simply do not rise to the level of red flags.  The interest rates offered on the units must be viewed in the context of AGF II's advance funding business.  While the 12% interest on the notes is much higher than T-bill rates, it is far less than the 21.99% interest rate charged on some consumer credit card balances.  It is not intuitive that a 12% rate of interest on notes that are being marketed as speculative is unusual or suspicious.  Even if 12% interest rates were a "red flag," it is clear from his testimony that Allen and other PAA personnel had investigated in depth Johnson's business model for AGF II.   Both Allen and Johnson have testified that they explored alternative structures, e.g., one with a lower fixed return and an equity kicker.  Allen was well aware that, to cover the payments to unit holders, cover AGF II's expenses, and yield profits for the AGF II management company, advances would have to be made at higher interest rates, around 2% to 3% per month.  If this were a red flag, it did not dictate that the issuer be turned away, but rather that there be disclosure about this matter to investors.  In that regard, the risks involved in making advances at levels sufficient to generate funds to make distributions to the unit investors were clearly and prominently disclosed to investors in the 2011 PPM and 2012 PPM.

The final "red flag," that the offering depended on a single entity for cash flow, was also well understood by Allen and others at PAA. The testimony is clear that they were aware that, to mitigate conflicts of interest among competing AGF funds, investments would be funneled through American Growth Funding, which would then advance funds to borrowers on a co-mingled basis. This structure is not inherently more risky; use of a conduit does not result in AGF II putting all of its eggs in one basket, as Lowry's opinion suggests. But it is a way of mutualizing risk among the various AGF fund entities, and it is effective in avoiding favoritism. Again, even if this is somehow a "red flag," the PPM provides clear disclosure that AGF II may carry out its business with affiliated entities, and that co-investment could be used to address conflict of interest concerns.

Finally, Lowry's suitability analysis is not relevant to this case, and in any event is simply wrong. The Commission has brought charges under the anti-fraud provisions of the federal securities laws, not under FINRA's suitability rule. While a fraudulently induced investment is seldom if ever going to be "suitable" under FINRA Rule 2310, it absolutely does <u>not</u> follow that all unsuitable investments are fraudulent. Indeed, it has been my experience that FINRA usually does not bring fraud charges in cases where suitability violations are alleged.

Moreover, the analysis underlying Lowry's conclusion that these investments were unsuitable does not withstand scrutiny. Lowry does not allege deficiencies in PAA's procedures for assuring that only accredited investors were solicited. Nor does he allege that the investors were not informed that the units were risky investments, or that the investors did not understand the risks or were financially unqualified. Rather, in his opinion, the units were not suitable to be marketed to <u>any</u> investor because PAA did not use "reasonable diligence" to determine that they were suitable. This could only have been accomplished, in his view, if the PAA Defendants had "reviewed audited information before recommending AGF II to their customers." This opinion simply makes no sense. A newly formed business is seldom going to have audited financials during its first year of operations. If it did, the financials would relate to its formation process, not to its operations as a going concern, and would not provide any basis for understanding "the potential risks and rewards associated with the recommended

36

security." Based on Lowry's opinion, a broker-dealer would never be able to recommend investment in <u>any</u> newly formed business, because they would never have meaningful audited information to review. If a broker-dealer were incapable of evaluating the risks of investing in a company's securities without audited financials, one would have thought that the Commission would have adopted an explicit requirement to that effect. However, as discussed above, issuers using Regulation D are not required to have audited financials. Indeed, newly formed companies registering securities for sale to the general public on Form S-1 are not required by Regulation S-X to have audited financials.

**B.     PAA and Allen should have stopped selling the AGF II offering once it was brought to its attention that the 2012 PPM contained misstatements about past audits**

Lowry states that Allen knew by early summer 2012 that AGF II had not hired a qualified CPA to audit its 2011 financial statements, and that the 2012 PPM, as well as the 2011 PPM, inaccurately stated that AGF II had been and would continue to be audited. In his opinion, Allen could not, consistent with industry standards and applicable regulatory requirements, provide the 2012 PPM to potential investors because it contained misleading and inaccurate information about AGF II's past and future audits.

This part of his Lowry's opinion, much like the previous conclusions, hinges on his insistence on reading too much into the PPM's erroneous reference to the Company's "policy in the past," and his efforts to equate the reference to committing to have its financials audited to having actually produced those audits. Certainly, Allen was frustrated that AFG II's audits were not completed more expeditiously. The record in this case is replete with testimony and documentation of the efforts Allen made repeatedly to prod Johnson to secure an auditor, and to Johnson's commitment to do so. Based on those assurances from Johnson, and evidence of his efforts to secure an auditor, Allen maintained a good faith belief that the financials would be audited, and they in fact were. Lowry's opinion seems predicated on a view that, once Allen learned that audits had not been produced within 90 days of the end of the AFG II's fiscal year, sales under the PPM should have been halted. However, this was not a registered offering, where that time frame is prescribed. Neither the 2011 PPM nor the 2012 PPM contained a time frame for the production of audit financial statements. The Operating Agreement did include a contractual covenant to

produce audited financials within 90 days of the end of the Company's fiscal year. This provision was not referenced in the PPM. Nothing cited in Lowry's opinion, either as a matter of law, regulation or industry practice, supports a conclusion that non-performance of a contractual covenant in an Operating Agreement warrants immediately halting sales of securities covered by the Operating Agreement, much less supports a conclusion that continuing such sales is either per se unsuitable or furnishes a basis for a fraud claim.

In assessing whether such a shortcoming would warrant such a drastic measure, it is important to bear in mind the time commitment associated with investment in the units. These were not freely transferable instruments. Rather, purchases of the units were subject to a two-year lock-up. Investors making those purchases could not look to the audited financials for information that would assist them in deciding whether to retain their investments, for the simple reason that they had already entered into a two-year commitment. As it turned out, investors purchasing the units any time after late summer 2012, about the time Lowry insists Allen should have stopped selling the units, had audited financials they could reference in deciding whether to redeem their units.

## C. Wasserman should have prevented Allen and other PAA sales personnel from soliciting the AFG II unit offering.

Wasserman was the President and Chief Compliance Officer of PAA, and in those roles had supervisory responsibility at PAA, including with respect to the solicitation and sale of AGF II units to PAA customers. Lowry notes that Wasserman reviewed and approved the PPM, as evidenced by her initials on both the 2011 PPM and the 2012 PPM. He also avers that she was fully aware that AGF II had not obtained an auditor or conducted an audit and that the 2011 PPM and 2012 PPM contained false statements regarding AGF II being audited. She also admits that she never directed Allen or other PAA salespersons to stop soliciting AGF II units. Hence, in his view she reasonably failed to supervise the sales personnel because she failed to stop the sales, or require disclosure to customers that AGF II had not been audited.

This opinion, like the opinion regarding Allen, hinges on Lowry's insistence on reading too much into the representation in the PPM that AGF II, in keeping with its past policy, would have its financials audited. The record indicates that Wasserman discharged her responsibilities to oversee PAA's private placement program. Lowry acknowledges that she reviewed and approved the 2011 and 2012 PPMs, and he also acknowledges that she was aware of Allen's efforts to prod Johnson to hire an auditor, and Johnson's commitment to do so. Lowry may not believe that her judgment that an auditor would be retained by Johnson was well-grounded, but there is nothing in the record to suggest that she did not reach that judgment in good faith. That audits were in fact conducted demonstrates that her determination was justified. Having made a judgment that the financials would be audit, Wasserman could reasonably conclude, as she did, that it was permissible for Allen and other PAA personnel to continue to solicit sales of the AGF II units.

I reserve the right to supplement my report so that I may consider additional documents, testimony or arguments in forming my opinions.

March 3, 2017

Respectfully submitted,

*Richard T. Chase*

Richard T. Chase