**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | No. 16 Civ. 828 (KMW) |
| v. | ECF CASE |
| AMERICAN GROWTH FUNDING II, LLC, PORTFOLIO ADVISORS ALLIANCE, INC., RALPH C. JOHNSON, HOWARD J. ALLEN III and KERRI L. WASSERMAN, | |
| Defendants. | |

**PORTFOLIO ADVISORS ALLIANCE, INC., HOWARD J. ALLEN III AND KERRI L. WASSERMAN'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S SECOND OMNIBUS MOTION *IN LIMINE*** 

THE ROTH LAW FIRM, PLLC
Richard A. Roth
Jordan M. Kam
295 Madison Avenue, 22nd Floor
New York, New York 10017
Tel: (212) 542-8882
*Attorneys for Defendants Portfolio*
*Advisors Alliance, Inc., Howard J. Allen, III*
*and Kerri L Wasserman*

Dated: March 15, 2019

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT……………………………………………………………………1

LEGAL STANDARD…………………………………………………………………………….2

  1. The Court Should Not Exclude Evidence or Testimony that Will Assist the Jury
     In Determining Who the "Reasonable Investor" is, in the Market Place at Issue………..3

  2. The Court Should Not Exclude Any Language Contained in
     The Private Placement Memoranda………………………………………………………6

  3. The "Proportion" of PAA's Revenues Derived from AGF II Sales
     is Not Probative of Scienter and is Highly Prejudicial…………………………………..9

  4. The SEC's Argument that Johnson and the PAA Defendants are
     "Co-Conspirators" Such that Johnson's Testimony May be Used
     Against the PAA Defendants for the Truth of the Matter Asserted, is Frivolous……….12

CONCLUSION………………………………………………………………………….……17

Defendants Portfolio Advisors Alliance, Inc. ("PAA"), Howard J. Allen III ("Allen") and Kerri L. Wasserman ("Wasserman") (collectively, the "PAA Defendants"), respectfully submit this Memorandum of Law in Support in Opposition to Plaintiff Securities and Exchange Commission's ("SEC") Second Omnibus Motion *in Limine*, as follows:

## PRELIMINARY STATEMENT

The SEC omnibus motion *in limine* should be denied in its entirety.

First, the SEC argues that the Court should exclude evidence of investor sophistication. As stated in *United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018), however, investor sophistication is essential to the jury's necessary inquiry into determining who the "reasonable investor" is "in the market at issue" in this case. What the SEC is attempting to do by its motion, is to adjust the facts to make the "reasonable investor" in this case less sophisticated and more conservative. It does so because the incontrovertible evidence shows the "reasonable investor" in the market here to be a sophisticated one; whose investment strategy is to make a speculative and illiquid investment in a private placement of a newly formed entity with little to no operating history.

It is for this same reason that as a second argument, the SEC also seeks to exclude the risk and disclosure language from the private placement memoranda and subscription documents. As such, the SEC asks the Court in this securities fraud case to **not** provide the trier of fact with the "total mix" of information that was made available to investors.

Next, and despite the fact that the PAA Defendants have already stipulated to the jury being provided with information regarding PAA's revenues generated from the sale of AGF II securities, the SEC now asks the Court for permission to offer evidence of the "percentage" of PAA's revenues generated by the sale of AGF II securities, versus the percentage of revenues

1

PAA generated through other business means. This type of analysis (of which the SEC provides no on point authority) may confuse the jury on the issue of scienter and cause significant prejudice. It will also substantially and unnecessarily elongate the trial; as evidence relating to PAA's other actual and potential business opportunities during that time period would become relevant. As explained below, the jury will hear evidence of PAA's revenues generated through the sale of AGF II securities. The analysis the SEC is now requesting to provide to the jury is problematic and prejudicial.

Finally, the SEC seeks permission to use at trial the out of court statements of non-party Ralph Johnson for the truth of the matter asserted under the "co-conspirator-in-furtherance exception" to hearsay rule (Rule 801(d)(2)(E)). As explained below, the SEC's arguments in support of that theory are frivolous.

## **Legal Standard**

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 467 (S.D.N.Y. 2005) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). "However, evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *MBIA Ins. Corp. Patriarch Partners VIII, LLC*, No. 09 Civ. 3255, 2012 WL 2568972, at *2 (S.D.N.Y. July 3, 2012) (internal quotation marks and citations omitted). In addition, the Court may reserve judgment on the motion until the appropriate factual context is developed at trial. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).

1. **The Court Should Not Exclude Evidence or Testimony that Will Assist the Jury in Determining Who the "Reasonable Investor" is, in the Market Place at Issue**

As a preliminary matter, it should noted that the SEC's point heading on this issue is entitled "Evidence of Victim's Status as Accredited is Irrelevant and Prejudicial" -- but the SEC concludes its argument in that section by stating, "[t]he Court should exclude evidence of investor sophistication." *See*, SEC MOL, pgs. 5 and 8.  These are related, but different arguments.

With respect to whether investors are "accredited," what we offered the SEC during our meet and confer (to no avail) was to not raise any issue regarding investors being "accredited" in terms of their specific financial status, if the SEC agreed not to offer evidence or testimony arguing that the PAA Defendants made any "unsuitable" investments in AGF II -- which the SEC's expert, Robert Lowry, explicitly placed at issue in his report.  For example, at page 8 of Lowry's Expert Report,[1] Lowry states as part of his "suitability analysis" that:

> Members and their associated persons must reasonably believe that the product is a suitable investment prior to making a recommendation to a particular customer.  To ensure that a particular investment is suitable for a specific customer, members and their registered persons must examine: (1) **the customer's financial status**; (2) **the customer's tax status**; (3) **the customer's investment objectives**; and (4) **such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customers**.

Lowry Report, pg. 8 (emphasis added).

According to Lowry: "[w]hen salesmen recommend a purchase of a security to a customer, they must have a reasonable basis to make the determination that the security is suitable before they make any recommendations to a customer." *Id*.

---

[1] The "Lowry Report" is annexed to the Declaration of Alexander Vasilescu, dated March 8, 2019, in support of the SEC's motion (Doc. 217) (the "Vasilescu Dec."), at <u>Exhibit 5</u>.

As a result of Lowry's "suitability analysis" contained in his expert report, **the SEC** has put directly at issue (separate and apart from whether the PAA Defendants committed securities fraud) whether the PAA Defendants made "unsuitable" investment recommendations in potential violation of various FINRA rules and Notices to Members (which Lowry cites throughout his report). Part of that "suitability analysis" -- according to the SEC's expert -- is the financial status of the investors, which is also relevant to whether an investment is "accredited" under Regulation D. To be clear, the PAA Defendants would prefer the financial status of any investors not be at issue during the trial -- nor does the Complaint even allege any claims for "unsuitability" under FINRA rules (which is why the PAA Defendants have separately filed a motion *in limine* excluding all such evidence and testimony on that issue) (ECF Doc. 210).

However, to the extent the SEC puts on any evidence or testimony regarding whether the AGF II investment was "suitable" to any investors, the PAA Defendants must be permitted to defend against such allegations without exclusion of facts that are necessarily a part of that defense. In any event, the SEC has put squarely at issue the "accredited" nature of the investors.

With respect to the "sophistication" of a "reasonable investor" in the securities at issue here, the Court should not exclude any such evidence or testimony. Contrary to the SEC's arguments, the PAA Defendants do not believe these are issues of reliance or loss causation. But rather, the sophistication of PAA's customers go to materiality and scienter.

The SEC cites to *United States v. Litvak*, 889 F.3d 56, 65 (2d Cir. 2018) for the proposition that "[a] finding of materiality does not require proof of 'actual reliance." SEC MOL, pg. 7. But reliance is not an argument advanced by the PAA Defendants. In fact, the Second Circuit in *Litvak* stated the complete opposite of what the SEC argues herein. That is, the sophistication of PAA's customers is absolutely relevant to the issue of materiality:

4

> A misstatement in a securities transaction is material so long as there is a 'substantial likelihood that a reasonable investor would find the … misrepresentation important in making an investment decision. A misrepresentation is important if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.
>
> The standard of a 'reasonable investor,' like the negligence standard of a 'reasonable man,' is an objective one. **The standard may vary, therefore, with the nature of the traders involved in the particular market**. The reasonable investor in a market in which many individual investors trade will be deemed to be somewhat less schooled and **sophisticated** than a reasonable investor in a market, like the one now before us, in which only institutions trade with the help of complex computer programs and professional traders.

*United States v. Litvak*, 889 F.3d at 64-65 (internal citations omitted) (emphasis added). Later in its decision, the Court in *Litvak* clarified the issue even further, stating, "the materiality standard is an objective one and centers on the views of a hypothetical, reasonable investor **in the market at issue**." *Id.*, pg. 68 (emphasis added).

The "reasonable investor" in the market, here, is a sophisticated one; whose investment strategy is to make a speculative and illiquid investment in a private placement of a newly formed entity with little to no operating history. In fact, one of the approximately three investors the SEC intends to call as a fact witness at trial, Lawrence Sucharow (who is the founder and Chairman Emeritus of the prominent law firm Labaton Sucharow LLP), is a highly sophisticated securities class action attorney.

Of course, the SEC now seeks to exclude all evidence of investor sophistication, but doing so would be contrary to Second Circuit authority, as investor sophistication goes to the heart of the juries' necessary inquiry into who the "reasonable investor" is "in the market at issue" here.

Separately, the sophistication of PAA's customers who invested in AGF II also goes to the issue of scienter. That PAA's customers were sophisticated or experienced in investing in private placements of newly formed entities is highly relevant as to whether the PAA Defendants would have intended to mislead them.

2. **The Court Should Not Exclude Any Language Contained in the Private Placement Memoranda**

For the same reasons stated by the Second Circuit in *United States v. Litvak*,[2] it is vital that the Court not exclude **any language** contained in the private placement memoranda at issue here; as doing so would explicitly withhold from the jury the "total mix" of information that was made available to AGF II investors.

PPM disclosures are relevant as they are part of the information that inform the jury of who the "reasonable investor" is. As stated above, and in accordance with *United States v. Litvak*, the "reasonable investor" in this case is a sophisticated investor, willing to make a highly speculative and illiquid investment in a private placement of a newly formed entity with little to no operating history. The disclosures contained in the PPMs speak to those issues. The fact that the "reasonable investor" in this case happens to be a sophisticated and experienced investor who seeks out speculative investments in new companies is not "prejudicial" to the SEC; they are just the facts of the case. What the SEC is attempting to do by its motion is adjust the facts to make the "reasonable investor" less sophisticated and more conservative. But that would not the ends of justice.

---

[2] 889 F.3d at 64 ("A misrepresentation is important if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered **the 'total mix' of information made available**.") (emphasis added)

Importantly, the SEC's apparent argument that the only language in the PPM that is relevant relates to the alleged "affirmative misrepresentations" regarding the audit (SEC MOL, pg. 9), is obviously erroneous. As but one example, in this Court's Opinion and Order, dated December 4, 2018 (ECF Doc. 187), which denied the SEC's first omnibus motion *in limine*, this Court pointed out that, "although the 2011 PPM states 'annual financial statements will continue to be audited,' it also states:

> The Company and the Manager are newly formed entities with no operating histories, and, accordingly, *no performance histories to which a potential Investor may refer in determining whether to invest in the Company*. The Company's prospects must be considered in light of the risks, expenses and difficulties frequently encountered by new ventures, including the reliance of the Company on the Manager and its key personnel and other factors.

ECF Doc. 187 (emphasis in original). And this is just one example of a PPM replete with risk disclosures regarding the fact that AGF II was a risky investment in a new company with little to no operating history. Thus, there is clearly other language in the PPMs that is directly relevant to the SEC's fraud allegations, which is why the Court must allow the jury to consider not just parts of the PPMs (as requested by the SEC), but the "total mix" of information contained therein.

This is particularly true with respect to the PPMs cautionary language about future risks -- including forward-looking statements -- since a jury could plausibly find that the "total mix" of information available to investors (including the fact that AGF II had no operating history when it was first disseminated in February 2011 and the Operating Agreement (dated February 11, 2011) created a contractual obligation on AGF II to provide audited financials within 90 days of the end of the of each calendar year going forward) meant that the audit language at issue in the PPM was intended to convey a forward-looking statement of intent for AGF II to produce those audits.

7

The risk disclosures are also relevant in connection with the anticipated testimony of PAA Defendants' expert, Richard T. Chase.  As stated in his expert report:

> An examination of the items identified in the survey reported at the end of the notice demonstrates the challenges of conducting a 'more thorough review' of a newly formed entity.  Among the items included on the list of items suggested for review are: historical financial statements; trends indicated by the financials; internal audits controls; contacts of customers and suppliers; contracts; leases; mortgages and other contracts; past securities offerings; pending litigation; previous regulatory or disciplinary problems of the issuer; patents and other intellectual property rights; issuer's assets and facilities; and engineering, geological and similar reports.  Few if any of these items are likely to exist with respect to a newly formed entity that has not previously been in business.  None existed at AGF II prior to the 2011 PPM.  Other items on the FINRA survey checklist can and should be examined – e.g., the business of affiliates, the issuer's management and its expertise and regulatory history, management compensation, and business plans and business models.  Nevertheless, even some of these items will not be amenable to the detailed, tangible examination possible of the ongoing business activities of an established issuer.  Faced with this reality, a broker-dealer conducting a 'reasonable investigation' of a newly formed entity should try to conduct a reasonable investigation of what little tangible information may be available, **but otherwise will address this challenge by assuring that there is clear and forthright disclosures in offering documents of the risks posed in investing in the securities of the new enterprise**.

Vasilescu Dec., Exhibit 1, Chase Report, pg. 24 (emphasis added).

Finally, it is curious (and perhaps telling) that one of the examples of PPM language that the SEC seeks to exclude is: "AGF II's manager 'may enter into a co-investment or joint venture arrangements." SEC MOL, pg. 4.  This disclosure made to investors (among other disclosures contained in the PPMs regarding conflicts, but not cited by the SEC in its motion) directly relates to one of Lowry's opinions stated in his expert report, wherein he states, "[a]n independent audit by a qualified CPA firm would provide answers to PAA and its salesmen about the (1) **conflicts of interest between Johnson and Allen entities** and (2) details about the loans made and approved by the AGF II Management Board." Lowry Report, pg. 16 (emphasis added).  Here,

8

disclosures regarding conflicts were made in the PPMs, and this is why the SEC now seeks to inappropriately exclude such language at trial.

It would be severely prejudicial and contrary to law for the Court to exclude any portion of the "total mix" of information provided to the AGF II investors.

### 3. The "Proportion" of PAA's Revenues Derived from AGF II Sales is Not Probative of Scienter and is Highly Prejudicial

The SEC intends to prove scienter by showing that PAA's sales of AGF II securities made up a certain percentage of PAA's total revenues. According to the SEC: "the significant amount of PAA's fees derived from AGF II permit the reasonable inference that Defendants had a reason to lie and/or to look the other way when others lied. This, in turn, permits the Jury to conclude that Defendants' acted intentionally or recklessly, and not out of innocent mistake or negligence." SEC MOL, pg. 10. In support of this position, the SEC informs the Court that "courts routinely turn back attempts to exclude evidence of **a defendant's compensation** in fraud cases." *Id*. (emphasis added). This argument is misleading, but the cases cited by the SEC do not in any event support its ultimate position.

The argument is misleading because, as conceded by the SEC earlier in its brief, the PAA Defendants have already "agreed to stipulate to the total revenue" derived by PAA's sales of AGF II securities. SEC MOL, pg. 4. This is the information that courts have concluded (including the cases cited by the SEC as explained below) may be relevant and not unduly prejudicial on the issue of scienter -- and providing that information to the jury (*i.e.*, revenues derived by PAA from AGF II sales) strikes an appropriate balance between those competing interests. The SEC, however, wishes to also provide information to the jury regarding other revenues generated by PAA (not from AGF II sales), that the SEC can then ask the jury to infer from those data points that the "percentage" of revenues derived from AGF II sales is some sort

9

of per se indicator of scienter. This request by the SEC is unsupported by the law and could substantially elongate the trial – as the PAA Defendants must then be permitted to testify on issues regarding, among other things, how PAA generates business, what other business it could have obtained had it not been working with AGF II and how that other potential business could have affected PAA's revenues during that same time period. Putting aside how this would elongate the trial, however, what the SEC seeks to do is improper.

First, the SEC's citation to *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) is misplaced. *Quattrone* was a criminal case wherein the district court permitted the defendant's compensation "for the limited purpose of establishing a motive **to obstruct**…" *Id*., 441 F.3d at 187 (emphasis added). "To prove obstruction of an agency proceeding" as the court held, required the government to establish that "(1) there was a proceeding pending before a department or agency of the United States; (2) there defendant knew of or [believed] … that the proceeding was pending; and (3) the defendant corruptly endeavored to influence, obstruct, or impede the due and proper administration of the law under which the proceeding was pending. The latter element requires a wrongful intent or improper motive to interfere with an agency proceeding, including the judicially grafted nexus requirement." *Id*., at 174. Thus, unlike the securities fraud statutes at issue here, which requires proof of "scienter" -- the criminal statute at issue in *Quattrone* merely required a showing of motive.

The SEC's reliance on the District of New Mexico's holding of *SEC v. Goldstone*, No. 12 Civ. 257 (JOB), 2016 WL 3654273 (D.N.M. June 13, 2016), is also misplaced. In *Goldstone*, the SEC alleged that the Defendants misled and withheld important financial information from Thornburg Mortgage's outside auditors, KPMG LLP, such as the impending collapse of a large European hedge fund that held mortgage-backed securities similar to the Thornburg Mortgage's

adjustable rate mortgage securities." *Id*., \*1.  The *Goldstone* court, after analyzing the specific nature of the claims alleged -- and after recognizing that "motive and opportunity alone are not dispositive" (*Id*., \*15) nor are common motives to executives generally permissible to prove scienter (*Id*., \*16) -- concluded that the probative value of allowing "limited information" of the defendants "salaries, the dividends, and the bonuses that they received **from Thornburg Mortgage** in 2006, in 2007, and in 2008." *Id*., \*17 (emphasis added).  Notably, however, the Goldstone court held: "**[t]he Court will exclude all other income-related evidence at this stage**." Id. (emphasis added).  Thus, the SEC in *Goldstone* was **not** permitted to provide evidence to the jury regarding the percentage of revenues those defendants received from Thornburg Mortgage during the years in question versus any other income or sources of wealth.[3]

Here, the PAA Defendants have stipulated to the jury hearing evidence of the compensation earned by PAA in connection with sales of AGF II securities.  Anything more is not relevant and highly prejudicial.  There is simply no basis for the jury to also hear about "other income-related evidence" so that the SEC can perform an unprecedented percentage-based comparative analysis.

---

[3] The SEC's citation to the Southern District of Indiana's decision in *SEC v. ITT v. Educ. Servs., Inc.*, is of the same misplaced nature. In that case, evidence of the defendants' compensation in connection with the alleged fraud at issue was permitted, as it provided a motive to misrepresent their employer's financial situation so that they can continue to be employed. 2018 WL 3008632, \*7 (S.D. Ind. June 15, 2018). The same is true in connection with *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006). *Quattrone* was a criminal case wherein the district court permitted evidence of the defendant's salary to establish a motive for him to obstruct an investigation that presumably would have ended defendant's receipt of that salary. *Id*., 441 F.3d at 187.  Neither of these cases deal with the separate issue of whether the SEC may present evidence -- not of the compensation earned through the alleged fraudulent conduct -- but by additional compensation earned by defendants having nothing to do with the alleged fraudulent conduct (so that the SEC can then make some kind of unprecedented comparative analysis).

Finally, the SEC's argument that Chase testified in response to the SEC's deposition questioning that AGF II sales made up approximately "twenty to forty percent" of PAA's business and then agreed with the SEC's questioning that it was a "large percentage" is totally meaningless. A reading of Chase's testimony shows that he was answering a question concerning mere arithmetic -- as no analysis of any kind (legal, industry or otherwise) was asked about or provided. It was an off-the-cuff response to a silly question.

The SEC's "large proportion" analysis is unprecedented, inappropriate, confusing, highly prejudicial -- and should be excluded as such.

4. **The SEC's Argument that Johnson and the PAA Defendants are "Co-Conspirators" Such that Johnson's Testimony May be Used Against the PAA Defendants for the Truth of the Matter Asserted, is Frivolous**

The SEC argues that under Rule 801(d)(2)(E), Johnson's statements are admissible for the truth of the matter asserted against the PAA Defendants, because they are "co-conspirators" such that they were acting as agents of each other. SEC MOL, pgs. 11-13. The SEC's citation to caselaw is misleading -- and its argument is nothing short of frivolous.

Rule 801(d)(2)(E) provides: "A statement is not hearsay if … [t]he statement is offered against a party and is … (E) a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." "To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

The SEC informs the Court that "[t]here can be no doubt" that "the existence of a common enterprise in which both Johnson and Defendants participated is established by a preponderance of the evidence" (SEC MOL, pg. 12); and in support thereof, the SEC points to

the following: (1) "AGF II retained PAA to sell its AGF II securities, and that Allen and Wasserman were principals of PAA"; (2) "Johnson and Allen were partners overseeing AGF II"; (3) "Allen agreed with Johnson regarding the need to complete AGF II's audits"; and (4) "Johnson has proffered and is expected to testify that he, Allen, and PAA worked together on the PPMs." SEC MOL, pg. 12.

As result of this purported "conspiracy," as argued by the SEC, the SEC intends to call witnesses who will testify as to statements Johnson made to them regarding Johnson's desire avoid a proper audit (*see*, SEC MOL, pgs. 12-13) -- and then use those statements Johnson against the PAA Defendants for the truth of the matter asserted. This is totally inappropriate under the very caselaw cited by the SEC.

In *United States v. Russo*, 302 F.3d 37 (2d Cir. 2002), the Second Circuit explained in great detail how the "co-conspirator-in-furtherance exception" may be used, and how it may not be used. In making this point, the court in *Russo* revisited its holding in *Gigante* and held:

> [In *Gigante*] [w]e affirmed the conviction but explained that this evidence should have been excluded. The defendant was not a part of a conspiracy to murder Vastola. The statements of others made in furtherance of a plan to murder Vastola could not be received against him because he was not a part of such conspiracy. The fact that the defendant and the declarants were members of a 'general overriding conspiracy' constituting the Mafia did not make the statements of others, made in further of this murder, admissible against the defendant.
>
> Where evidence is offered against a defendant consisting of a declaration by an alleged co-conspirator in furtherance of some criminal act, we explained that the court in each instance must find the existence [between the defendant and the declarant] of a specific criminal conspiracy [to do that criminal act]. The 'general existence of the Mafia' does not suffice. We observed that the district court's expansive rationale 'would allow the admission of any statement by any member of the Mafia regarding any criminal behavior of any other member of the Mafia [against the latter].' This was unacceptable when the speaker and the defendant were not jointly engaged in the criminal venture that was being advanced by the speaker.

13

302 F.3d at 44 (emphasis added).  Summarizing the issue even further, the Second Circuit stated:

> The point of the observation in Gigante was that a declarant's statement made in furtherance of a criminal act – a murder in that case – is not admissible against the defendant under the co-conspirator exception unless the defendant was associated with the declarant in a conspiracy or joint venture having that criminal act as its objective.  An association between the defendant and the declarant in some other venture – and in particular a general association between them in the Mafia – will not suffice.

*Id*.

Here, even accepting the SEC's statements as true as to what constitutes the "conspiracy" (*i.e*., AGF II retained PAA to sell its AGF II securities and thereafter Allen and Johnson agreed that AGF II should be audited), that is at best a general association, much like "the Mafia" in the *Gigante* case (with the difference being, of course, that the association described by the SEC is in no way illegal).  Exactly like in *Gigante*, however, the SEC is now trying to impermissibly use that general association to foist upon the PAA Defendants a distinct narrow objective that Johnson had (*i.e.* the avoidance of a proper audit) -- of which there is no evidence that the PAA Defendants were participants.

And not only were the PAA Defendants not participants in Johnson's alleged objective of avoiding a proper audit, the **SEC admitted in its Complaint that Allen was a *victim* of Johnson's lies on that very issue**.

Under a section entitled "*Johnson Lies about the Status of AGF II's Audits*" (emphasis in original), the SEC admits in its Complaint:

> 49.  During 2012 and 2013, Johnson contacted several accounting firms, but as time passed without AGF II having retained an auditor, Allen grew increasingly concerned and repeatedly asked Johnson about the status of his discussions with auditing firms. **On multiple occasions in 2013**, **Johnson falsely told Allen** and others that AGF II had retained an auditor.

14

50. During 2013, Johnson told Allen that he had contacted an accounting firm ("Accounting Firm #2) about an audit. On May 15, 2013, Allen emailed Johnson to ask whether AGF II had retained Accounting Firm #2, and Johnson responded by email that same day: "I will be cutting a check this week and then [the partner at Accounting Firm #2 whom Johnson had contacted] will send back documents."

51. In fact, as Johnson knew, or recklessly disregarded, AGF II never retained Accounting Firm #2 to perform an audit, and Accounting Firm #2 never agreed to do so. Indeed, prior to his May 15, 2013 reply email to Allen, Johnson had rejected the idea of retaining Accounting Firm #2 for an audit after the firm informed Johnson that an audit would cost approximately $100,000, and Johnson's discussions with Accounting Firm #2 were thereafter focused solely on potential non-audit work – *i.e.*, a compilation of AGF II's financial statements and preparation of its tax returns.

52. On May 20, 2013, Allen again asked for an update, and Johnson responded: "Spoke to [the Accounting Firm #2 partner] and he said we have to wait a few more days. Update you later this week."

53. On May 24, 2013, responding to Allen's May 15, 2013, email asking whether AGF II had hired Account Firm #2, **Johnson again responded falsely**: "I would say yes but we haven't 'officially' gotten back his signed agreement. But verbally he said yes and we should have it any day."

54. On October 1, 2013, Johnson emailed Allen to report that "AGF has engaged [another accounting firm ("Accounting Firm #3)] as auditor." Again, Johnson knew, or recklessly disregarded, that **this statement was false**. Account Firm #3 was never engaged to provide any services, audit or otherwise, to AGF II or to any entity connected to Johnson. Although Johnson met with Accounting Firm #3 during 2013 to discuss a potential compilation and tax return preparation for AGF II, Johnson never discussed the possibility of an audit with Accounting Firm #3. Thus, contrary to Johnson's representation, Account Firm #3 never agreed to audit AGF II's financials, and never performed any audit work for AGF II.

55. Allen responded by email to Johnson's October 1, 2013, email on the same date with the question: "What years are they auditing? As soon as you get the engagement agreement could you send it [to] me?" Johnson replied by email on the same date: "Yes. I should have it in a day or so, I just left his office with a check. They are

15

|     |     |
| --- | --- |
|     | auditing 2011 and 2012, and will try and complete immediately so they can do 2013 on time as well." |
| 56. | **Yet again, every detail of Johnson's October 1 reply was false**. As Johnson knew, or recklessly disregarded, no engagement agreement for an audit by Accounting Firm #3 exited.  Moreover, neither Johnson nor AGF II, nor anyone on behalf of either, ever made any payment to Accounting Firm #3.  And, finally, Account Firm #3 never performed any audit work for AGF II. |
| 57. | **Johnson repeated this lie in an email discussion with AGF II's outside counsel** later that week.  In response to an October 7, 2013, email from counsel to Johnson and Allen's personal assistant asking when the audit for 2011 would be ready, Johnson wrote that Accounting Firm #3 was "working on it now and it probably will be done before year end." |
| 58. | **Johnson again misled AGF II's counsel and PAA** in an October 8, 2013, email.  In response to an email from counsel asking whether Accounting Firm #3 would audit the financial statements for 2011 through 2013, Johnson wrote to counsel and Allen's assistant: "Yes, 2011-2013 and foreseeable future." |

Complaint, ECF Doc. 6 (emphasis added).

The SEC now argues that "the preponderance of the evidence already shows that Johnson and Defendants may have been similarly motivated when making statements to others about the AGF II's audits." SEC MOL, pg. 13.  This argument is not only disingenuous, it is not plausible, as Johnson was lying to Allen about the subject matter at issue.

Finally, the SEC argues that, "[t]hat Court should reach the same conclusion with respect to Johnson's statements to the SEC.  Because both Johnson and Defendants were, at the time of Johnson's statements, co-defendants in this action, the two had an obvious, common goal – to cover up the fraud and defeat the SEC's charges against them." SEC MOL, pg. 13.  This argument is plainly offensive, and without any legal or factual basis whatsoever.

Put differently, the SEC is arguing that every defendant in a litigation commenced by the SEC is **presumed guilty** -- and any effort to defend the claims asserted by the SEC would, in and of itself, constitute a "conspiracy" to "cover up" the defendant's guilt. The SEC cites no law in support of its novel legal theory.

## **CONCLUSION**

For the reasons stated herein, the PAA Defendants respectfully request the Court deny Plaintiff's second omnibus motion *in limine*, together with any other relief this Court deems just and proper.

DATED:   New York, New York
         March 15, 2019

THE ROTH LAW FIRM, PLLC


By:   s/ Richard A. Roth
      Richard A. Roth
      Jordan M. Kam
295 Madison Avenue, 22nd Floor
New York, New York 10017
Tel: (212) 542-8882
*Attorneys for Portfolio Growth*
*Funding II, LLC, Howard J. Allen III*
*and Kerri L. Wasserman*